In these consolidated cases, a visiting judge in the Lake County Court of Common Pleas, Juvenile Division, found that appellant, Corrine Walsh, was guilty of neglect of her two sons, Douglas, age eight, and Keith Zeiser, age six. Appellant has appealed separate judgments as to each boy, asserting one assignment of error: "The trial court's finding that the children in controversy were neglected children was not supported by sufficient evidence." We find that there was sufficient evidence.
R.C. 2151.03(A)(2) defines a neglected child as one "[w]ho lacks adequate parental care because of the faults or habits of the child's parents * * *." R.C. 2151.011(B)(1) defines "adequate parental care" as, in pertinent part, "the provision by a child's parent or parents * * * of adequate food, clothing, and shelter to ensure the child's health and physical safety * * *."
We agree that parental supervision per se is not expressly mentioned in the definition of adequate parental care. Webster's Third New International Dictionary defines "shelter" as "something that covers or affords protection esp. from the elements: something that provides refuge or defense (as from injury, exposure, observation, attack, pursuit, danger, or annoyance): a means or place of protection: an area of safety * * *."
Thus, we conclude that a reasonable interpretation of the intent of the statute would include the scenario by which small children are left alone with no adult supervision. The concept of "shelter" would encompass such a situation. That circumstance certainly could constitute a danger to their physical health and safety and put them at undue risk.
We do not quarrel with the idea that all parents have a fundamental right to control the raising of their children.Zivich v. Mentor Soccer Club, Inc. (Apr. 18, 1997), Lake App. No. 95-L-184, unreported, at 3 (Ford, P.J., concurring in judgment only), affirmed (1998), 82 Ohio St.3d 367. While the instant matter was not a situation where the state sought to remove the children, the rights of a parent to be free from unnecessary state interference are no less important. To ensure that the state does not lightly interfere with this right, it is required that a charge of neglect must be proven by clear and convincing evidence. R.C. 2151.35(A).
As for what constitutes clear and convincing evidence, the Supreme Court of Ohio has observed:
 "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
As will be seen, some of the evidence presented created a credibility issue which the juvenile court had to resolve. The county's case focused on the testimony of a social worker who testified that, on March 28, 1997, she paid appellant an unannounced visit in response to a confidential complaint about the lack of supervision for the children. The subsequent testimony of all witnesses regarding these unsupervised incidents, which were the basis of the charges, can be grouped into three categories.
First, the social worker testified that appellant admitted to her on this first visit that both boys were "latchkey" kids, that they were home alone every day for about two hours, from the time they got off the school bus at 3:15 p.m. to the time she came home from work at 5:15 p.m. to 5:30 p.m. The older boy, Douglas, who was eight at the times specified in the neglect complaint, was left in charge of the younger boy, Keith, who was six.
Second, appellant allegedly admitted to the social worker that six-year-old Keith was left by himself on Wednesdays and Fridays from 7:00 a.m., when appellant went to work, until 3:15 p.m., when Douglas came home from school. Wednesday and Friday were the two full days when Keith did not have kindergarten. The social worker emphatically claimed that appellant admitted to her that Keith was left this way essentially every week since the beginning of the school year on September 1, 1996 until the March visit.
Appellant testified at the adjudicatory hearing that while she told the social worker that Keith was home alone "frequently," the social worker did not ask her for specific times or dates. Thus, at the hearing, appellant now claimed she had not been referring to the first semester interval. Both she and Bill Nichols ("Nichols"), her live-in companion, testified that she had left Keith alone only for the two Wednesdays and the two Fridays preceding the unannounced March visit.
The social worker testified that on April 16, she served appellant with the two complaints, which specified the time frames as beginning on September 1, 1996. At that time, she said appellant acknowledged that the facts alleged in the complaint were true. Those allegations included the Wednesday and Friday claims of no supervision for Keith since the beginning of school, as well as the two-hour after school latchkey claims. However, in reference to the complaints, appellant told the social worker that she did not feel that she had done anything wrong, as the boys were capable of staying home alone. It was evident to the social worker that, absent intervention, appellant intended to continue this practice. At the hearing, appellant denied these admissions.
Third, appellant admitted, both to the social worker and in her testimony at the hearing, that she left the children while she and Nichols attended a wedding receptiol on March 21, 1997, from 6:00 p.m. to midnight. The social worker testified that she was specifically told at the March interview that the boys did not have a telephone number to contact appellant at the reception. This incident was also part of both complaints, but the complaints were silent as to availability of possible telephone contact.
Appellant and Nichols testified that they put the boys to bed early and went to the reception which was only a few miles from the house. Appellant and Nichols also testified that she had her cellular phone with her at all times and that the boys could have contacted her if they needed to. There was apparently no mention of the existence of a cell phone to the social worker at the time of the March visit and interview or when the complaints were served and discussed.
The social worker testified that during her unannounced March visit, Douglas, the older child, became locked in the bathroom and could not get out. Both she and appellant tried to open the door, but could not. Appellant had to call Nichols at the bowling alley where he worked, to come home and open the door. While the women waited for Nichols, the social worker testified she pointed out to appellant in March that this incident was an example of the type of emergency situation that could befall the boys if they were home alone, suggesting that there could have been a fire while one of them was inside the bathroom.
Appellant responded to her by dismissing the incident, saying that it had happened before, that the boys were not harmed by being locked in the bathroom, and, if there were a real emergency, they could climb out the bathroom window. Douglas was trapped for approximately twenty to twenty-five minutes.
There was testimony by the social worker that the Lake County Department of Human Services has enacted an internal policy of "supervision guidelines," according to which a child under the age of nine years should never be left home alone, regardless of the individual child's maturity level. In defense of the policy, the social worker argued that one can imagine a whole host of dangers that may befall an unattended youngster, such as a fire, strangers coming to the door, and ingesting toxic or poisonous chemicals or medicines.
The social worker and appellant both testified that during the March visit, the social worker discussed two possible options for care: latchkey services and protective care paid for by children's services. The social worker said she would investigate the availability of these two possibilities and get back to appellant.
The testimony differed as to what was said in regards to whether or not appellant was told by the social worker that she had to plead guilty to child neglect in order to become eligible for protective services. Appellant says that she was told this by the social worker, but the social worker vehemently denied this. The social worker indicated she told appellant that only an agreement of cooperation with the client had to be reached in order to be eligible and that a guilty plea to the neglect charge was not necessary.
On April 4 and April 16, the social worker contacted appellant by phone to inform her of her eligibility, but appellant responded that she had no need for those services, and she wanted the boys to remain at home.
The evidence submitted by appellant at the hearing showed that she was a single mother trying her best to make ends meet and to provide a good home for her two sons. She worked as a "pricing specialist" and made about $8 an hour. The natural father paid child support, but had no contact with the boys for three years before the hearing, so appellant received no supervision help from that quarter.
Appellant stated she had been receiving government assistance for her child care expenses in the summer of 1996. With that assistance, she had been able to place Douglas and Keith in a day-care center while she was at work. When school started that September, she claimed her government assistance was eliminated, and she could not afford to keep her children in the day-care center.
In appellant's opinion, the boys were very mature and responsible for their ages. She testified that Douglas and Keith were both very intelligent, capable, and responsible. Nichols concurred that six-year-old Keith is very smart, very pleasant, understands situations well, enjoys people, and does not get into much trouble. He listens very attentively to everything an adult says to him. Nichols further said that Douglas, the eight-year-old, also is very smart, but is more inclined to read books than play sports.
Appellant considered leaving them home alone after school every day because she felt her budget would not accommodate any other solution. She claimed she called the Willoughby police department and asked if there was any age at which it was illegal to leave children alone, and she was told there was not. Appellant also said she called the director of the day-care center and asked her if she thought it would be appropriate to leave them home alone and said she was told it would be appropriate to leave them home alone. At the adjudicatory hearing, the director, in fact, testified that the boys were mature and responsible enough to be left by themselves for a few hours occasionally.
After that, appellant decided to leave them alone for the two hours after school. The social worker testified that in her March interview, appellant admitted that no adults arrived home until 5:30 p.m. At the hearing, Nichols testified to the contrary that he arrived home usually within twenty minutes of their arrival. Appellant's testimony was consistent with that provided by Nichols.
Appellant also testified extensively as to how she gave each of the children a key and provided them with a very detailed list of instructions. They were not allowed to use the stove. They could only use the microwave if they called appellant so that she could walk them through its operation step-by-step. They were not allowed to answer the phone if they did not recognize the phone number displayed on the Caller I.D. They were not allowed to leave the yard if they went outside. They were not allowed to answer the door.
If ever there were a problem and they needed help, appellant said she told the children to go to Danielle, their twelve-year-old neighbor. In fact, there was testimony from appellant and Nichols that there was no actual arrangement or understanding with Danielle or anyone else to the effect that the boys were relying upon them for assistance in an emergency. The social worker said appellant told her "* * * that there was this twelve[-]year-old available, that she wouldn't want to have this particular neighbor involved; and again, she just repeated that she didn't feel that it was necessary to make any arrangement for her children as she felt they were capable of being along [sic] for periods of time." The testimony of Nichols and the guardian ad litem confirmed that it was the twelve-year-old girl, and not an adult neighbor, who was the fail-safe person as far as the boys were concerned.
Appellant provided the boys with a series of telephone numbers, including her 1-800 work number, her cellular phone number, and Nichols' number at the bowling alley. The older child had memorized all these numbers.
The testimony was that they also were instructed to call 9-1-1, if there was an emergency. They were to call appellant at work when they arrived home. While they were home alone, appellant and Nichols claimed they would each frequently call to check on the boys. Also, appellant said the boys often called her for various reasons; for example, to get permission to eat a certain snack or to play a certain game.
As previously indicated, Keith attended kindergarten for two and one-half days each week. His off-days were Monday afternoons, all day Wednesday, and all day Friday. Appellant paid the day-care center to take him on Monday afternoons. On Wednesdays and Fridays, he was to accompany Nichols to work at the bowling alley.
The testimony of appellant was that sometime after the Christmas break, Keith asked Nichols if he could stay home and play his Nintendo video game instead of going to the bowling alley. Nichols testified he thought six-year-old Keith was very mature and responsible, so he agreed. Keith called his mother to report that he was at home. When appellant got home that evening, she discussed it with Nichols, and they agreed that Keith was responsible enough to stay at home alone if he wished, all day Wednesday and all day Friday.
Connie Fiorelli ("Fiorelli"), the supervisor of the day-care center in Willoughby, appeared on behalf of appellant and testified that appellant first placed both her boys in her day-care program in 1995. The boys attended the program off and on. Fiorelli testified that she was very familiar with both Douglas and Keith. Unfortunately, she had no records with her and was therefore unable to remember the specific time frames when they attended. Thus, she was unable to specify that Keith attended other than on Monday afternoons. She testified that Douglas was very mature for his age, and that he appeared to be much older than he actually was. Based on her experience, as a day-care supervisor for six years and her claimed intimate knowledge of the boys, Fiorelli said it was "absolutely" not inappropriate to leave either Keith or Douglas alone at homefor a couple of hours.
Interestingly, appellant did not subpoena or otherwise instruct Fiorelli, her own witness, to bring any records of the children's attendance at day care during the disputed fall interval. Thus, only appellant and Nichols testified that Keith spent his Wednesdays and Fridays there during the first four months of the school year.
Diane K. Delly ("Delly"), a friend of appellant also appeared and testified. She said she periodically baby-sat Douglas and Keith and had known the boys all of their lives. Delly testified that she worked at the same bowling alley as Nichols and that she has supervised a junior bowling league. Douglas and Keith belonged to the league and bowled with her about two or three times a week.
Delly testified that Keith is very energetic, is enthusiastic about bowling, and is very respectful to adults. Delly never had any disciplinary problems with him. She said he listens to what he is told to do and follows rules.
As for Douglas, Delly said there were no problems with his behavior. She indicated that "[w]hen I baby-sat for them * * * if there is any conflict or confliction [sic] between the two of them, they respond to my discipline and don't do it and I have no feed back, no back talk."
She said that Douglas understood and followed rules very well. Based on her experience with the Zeiser children, Delly said she thought it would be appropriate to leave Douglas at home with Keith for a few hours. Delly did not claim any formal child care credentials or training.
The social worker, who made the unannounced visit, testified that she interviewed the boys for about fifteen minutes. The social worker herself agreed that the boys were "very bright" and confirmed that they knew their mother's 1-800 telephone number at work, Nichols' work number, and the 9-1-1 emergency number. The guardian ad litem specifically asked "[d]id she indicate to you how she was accessible to her children? Did she had [sic] a cell phone, a beeper anything like that?" The social worker responded "She [appellant] indicated that she had an 800 number for work, at her work, they could call through the 800 number."
This case is also unusual because the guardian ad litem,
appointed to represent the children in this matter, recommended that the court not find that appellant neglected her sons. She stated:
 "Your Honor, this is a very difficult case. I believe that based on the testimony that was presented here, today, there's certain aspects of the complaint that haven't been sufficiently [sic] proven * * *.
"* * *
 "It does not appear that Ms. Walsh is an uncaring or unconcerned parent. It doesn't appear that's [sic] it's an ideal situation that the children are left alone for any period of time * * *; however, being one in her situation, it appears that she's made particular sadeguards (inaudible) in a particular fashion to handle various situations, and maybe these children are different from most kids their age.
 "The testimony coming from people who knew the children, Ms. Walsh, Bill Nichols, Connie Fiorelli, the day care provider, and * * * [Diane Delly], all people who know the children well, is that they're very mature, very responsible, and the opinions of each of those people, who are parents themselves, is that the kids are capable of being left home alone.
 "That may not be something that I would do or some of the others present in the courtroom would do, but that's the opinion of people who know these children as opposed to the opinion of a social worker who met with the children briefly.
 "I would have to assume, then, that the Department is going by a general rule, since they don't know the kids individually, they did not interview teachers or neighbors, they are making a generalized assumption about children these ages, ages six and eight.
 "It doesn't appear to me, throughout the test — after listening to the testimony, that that level of adequate care, adequate parental care, whatever that means, was not met by Ms. Walsh in that she took all those other efforts and all those other steps to look into whether or not this was safe and that she put a lot of thought into it and is concerned about her children.
 "So I'm a little bit surprised at myself for even saying this, but it doesn't appear to me, in this particular case, that there is sufficient evidence to find that these children were neglected."
Whether a trial court correctly applied a given legal standard to a set of facts is a question of law which an appellate court may review on a de novo basis. See State v.Yemma (Aug. 9, 1996), Portage App. No. 95-P-0156, unreported, at 8. The Supreme Court of Ohio has also held:
 "Where the evidence in a case is conflicting, the Court of Appeals in an appeal on questions of law may not as a matter of law substitute its judgment as to what the facts are for that of the trial court, but where the issue is raised it may set aside the finding of the trial court as being against the manifest weight of the evidence, and remand the cause for a new trial. (Paragraph eight of the syllabus in the case of State, ex rel. Squire, Supt. of Banks v. City of Cleveland, 150 Ohio St. 303, approved and followed.)" Cross, 161 Ohio St., at paragraph five of the syllabus.
We do not believe that the only type of situation that would justify immediate state intervention is one in which the parent decides to leave children alone in a house with an undue danger or dangerous condition, such as a gun. See, e.g., In re:Leftwich (Apr. 22, 1997), Franklin App. No. 96APF09-1263, unreported, 1997 Ohio App. LEXIS 1676; In re: Skeen (June 23, 1994), Franklin App. Nos. 93APF12-1633, 93APF12-1634, 93APF12-1635, unreported, 1994 Ohio App. LEXIS 2746.
Appellant and the guardian ad litem appear to argue that if children, regardless of age, are found to be highly intelligent and very mature for their ages, then they are presumptively capable of caring for themselves on a regular basis, either for a few hours or an entire day.
To the contrary, we believe that, regardless of maturity or intelligence, the ages alone of unsupervised children could constitute some clear and convincing evidence which showed that children of that age who were regularly left alone for extendedperiods of time, separately or together, were put at undue risk to their health and safety.
There were three facts which we believe were determinative of the issue of neglect: (1) the ages of the children; (2) the pattern, regularity, and length of the incidents of no supervision;[1] and (3) the likelihood that the lack of supervision would continue because of the inability or unwillingness of appellant to acknowledge the implicit and immediate danger of such a situation.
First, let us say that we would agree that allowing an eight-year-old child such as Douglas to fend for himself for two hours after school would raise a debatable question as to whether or not that constituted neglect. If it is, then thousands of children in this district are neglected. However, our situation is not that simple. Not only was Douglas left without supervision, he was required to baby-sit and interact with the six-year-old. We are apparently being asked to believe that there was never any horse play, rough housing, anger, resentment, jealousy, daredevil behavior, or poor judgment displayed between the two brothers during these unsupervised intervals. The guardian ad litem testified that Keith told her that sometimes they fought when they were home alone, that his brother picked on him, but that it was no big deal.
Common sense tells us that no matter how good, how mature, or how intelligent a six or an eight-year-old child might be, he is not good, mature, or intelligent all the time. To assert that such children will never put themselves in harm's way by doing something stupid or by panicking during a crisis is the height of self-deception on the part of a parent.
As previously indicated, there was, in fact, testimony that Keith was very athletic; that he does not get intomuch trouble; that he was very energetic; that he and his older brother accepted discipline very well. Another way of summarizing those comments would be to say that six-year-old Keith is a very active child who occasionally gets into trouble, and sometimes he and his older brother need to be disciplined.
That is the point of providing adequate supervision — to provide for the times when those aberrations in the behavior of "good" children occur.
Thus, we find absolutely no impediment whatsoever in determining that it constitutes neglect per se to allow a six-year-old child to be left alone for two entire days per week on a regular basis and to be regularly left at other times under the supervision of his eight-year-old sibling. As for Douglas we determine that minimally he was too young to be the "babysitter" for the younger child on a regular daily basis for intervals of two hours plus.
The second factor was the pattern and regularity of the lack of supervision. As previously acknowledged, there would be very few parents who could testify that they have never left their children unattended. As a result, the media regularly records tragedies which occur during those few moments of neglect, regardless of whether it was regular or occasional in nature. However, it is not the occasional lack of supervision that occurs on an irregular basis which is the issue here.
Although the sole "expert" witness, the day care supervisor, indicated that the children might be capable of being left alone occasionally for a few hours, she certainly did not indicate or imply that the children could be left alone daily after school for several hours.[2] Nor did she indicate that eight-to-ten hour intervals of no supervision was the equivalent of a "few hours," or that such extended intervals on a regular basis were adequate for a six-year-old.
While appellant testified that she saw no problem with the supervision of the six-year-old by the eight-year-old, the social worker testified that she told appellant on the March visit that such behavior was not fair to Douglas and was not a good situation. Frankly, expert testimony is not needed to reach the conclusion that the regular supervision of a six-year-old by an eight-year-old is an invitation to disaster.
This brings us to the third critical fact, namely the self-serving rationalization of appellant and her failure to acknowledge the inherent dangers of the situation, such that it was apparent that the situation would continue. It was obvious from the record that, for all intents and purposes, appellant had simply stopped using babysitters or caregivers, except for the Monday preschool program.[3] That is unacceptable.
Of necessity, the juvenile court is given a substantially greater amount of discretion than the rest of the court system. We sympathize and commiserate with the attorney who has to defend his or her client on neglect allegations in what is admittedly somewhat of a never-never land of both substantive and procedural law. There is, however, no legislation which is capable of defining every conceivable instance of child neglect. Thus, there must be a certain amount of common sense left for the juvenile court judge to exercise in interpreting the scope and intent of the phrase "adequate parental care," particularly when viewed in light of the definition ofshelter as discussed earlier.
Like the juvenile court, we agree that there was clear and convincing evidence of neglect. To wit, we find that, in light of the ages of the children, the regularity, pattern, and extended lengths of the unsupervised incidents, and the likelihood of continuance without intervention, there was clear and convincing evidence of inadequate parental care constituting neglect. Further, such behavior unreasonably exposed the children to undue risk to their health and safety. It was behavior in which a reasonable and responsible parent would not engage because of the risk.
We do not believe that the juvenile court was required to wait until a tragedy actually occurred in order to determine that it was very probable that a tragedy could and would occur if this pattern of behavior was allowed to continue uncorrected.
We agree that the law is sparse in this area. However, we would regard this instance as one of the few occasions in which we are willing to specify what a minimal bright line ought to be. That bright line is that a six and an eight-year-old, regardless of intelligence, maturity, or social adjustment, are too young to be left alone without adult supervision on aregular basis for hours at a time, much less an entire day.
For the reasons stated, the judgment of the juvenile court is affirmed.
 ------------------------- JUDGE JUDITH A. CHRISTLEY
FORD, P.J., concurs, NADER, J., dissents with Dissenting Opinion.
[1] The juvenile court specifically found appellant's testimony to be less than credible because he found the children were "left home on a regular basis without adequate supervision between from September 1, 1996 to April 9, 1997 * * *."
[2] We do not consider Delly to have been an "expert" witness.
[3] Nichols' testimony of his last specific recollection of using a babysitter was when he and appellant vacationed for a week in the spring of 1997 and left the boys with an adult sitter.