OPINION
{¶ 1} Cassandra and Lynn Corey appeal from the judgment of the Geauga County Court of Common Pleas, Juvenile Division, finding their three children to be neglected and dependent, and placing them under the protective supervision of the Geauga County Job and Family Services ("GCJFS"). We affirm.
 {¶ 2} On the evening of February 5, 2005, Newbury EMS responded to a 911 call from Zenith Drive in Newbury, placed by Mrs. Cassandra Corey, age twenty-four. Mrs. Corey informed the EMS crew that her ten-month old son, Curtis, had been playing on the floor, then began choking. She felt a piece of plastic in his throat, which she could not dislodge. EMS took Mrs. Corey and Curtis to Geauga Regional Hospital. Mr. Corey, a twenty-three-year old landscaper, remained home with the Corey's two daughters, Madison, twenty-three months old, and Callista, five years old.
 {¶ 3} Emergency room personnel at Geauga Regional were unable to identify any object in Curtis' throat, and advised transferring him to University Hospitals Rainbow Babies and Children's, in Cleveland, to which Mrs. Corey agreed. At Rainbow, the emergency personnel were able to extract a plastic wrapper from Curtis' throat. Mrs. Corey told the emergency personnel at Rainbow that Curtis began to choke while sharing a bag of potato chips with his five-year old sister, Callista.
 {¶ 4} The Rainbow physicians decided to hold Corey overnight, for observation. At one point during the night, Nurse Katie Battelline noticed that Mrs. Corey had given Curtis a plastic syringe wrapper with which to play. Nurse Battelline disposed of the wrapper, and talked with Mrs. Corey about the types of toys appropriate for an infant. Mrs. Corey seemed receptive to the information.
 {¶ 5} Regina Kessler, a Rainbow social worker, interviewed Mrs. Corey. Mrs. Corey told her that she had woken Curtis from his afternoon nap, changed him, and set him on the floor, then gone to check on whether her daughters were eating their dinners. When she returned, she put Curtis in his high chair, and began feeding him pudding, noticed him gagging, and discovered the plastic in his throat. Mrs. Corey told Ms. Kessler that she was "obsessive-compulsive" about cleaning the house, doing that three to four times a day, and dreaming of it.
 {¶ 6} Ms. Kessler talked with Mrs. Corey about safety for small children. Ms. Kessler was disturbed by the different stories concerning how Curtis got the plastic wrapper, by the fact that Mrs. Corey gave him another wrapper for a toy at the hospital, and by the possibility that Mrs. Corey might have a mental health problem interfering with her parenting. She referred the matter to GCJFS, with a recommendation that the Coreys be instructed in child safety.
 {¶ 7} Carrie Kowalski works for "Help Me Grow," a voluntary program available through GCJFS, which helps families with child-rearing problems. Ms. Kowalski met with Mr. Corey to explain the program; Mrs. Corey contacted Ms. Kowalski shortly thereafter, to arrange an initial home visit for March 17, 2005. On arriving at the Corey's residence, Ms. Kowalski noticed that there was a hole on the left side of the rear door, which was the main entrance. While not testified to by Ms. Kowalski, it appears from the record that there was considerable junk in the yard, the Corey's then-landlord being a scrap dealer.[1]
 {¶ 8} On entering the house, Ms. Kowalski found some holes in the interior walls as well. The rear door leads into the kitchen; the main room is accessible by a step leading down from the kitchen. The furnace had been out for several days, and the Coreys were heating the home by running the stove, which sits directly next to the step leading into the main room. Ms. Kowalski saw Curtis crawling toward the red-hot stove. She cried out, and Mr. Corey picked Curtis up within a foot of the stove. It appeared to Ms. Kowalski that the Coreys were unconcerned by this incident, assuring her that eleven-month-old Curtis knew not to touch the hot stove.
 {¶ 9} Ms. Kowalski insisted that some barrier be placed between the kitchen and the main room. March 18, 2005, around 12:30 p.m., Mrs. Corey stopped by GCJFS, to obtain some diapers. She met for about a half-hour with Ms. Kowalski, Danielle Coward, a GCJFS social worker, and Matt Battiato, a supervisor. It was agreed that Ms. Kowalski would obtain a baby gate at K-Mart to block the kitchen entrance at the Corey's house. Shortly before 1:00 p.m., Ann Marie Stults, a case manager at GCJFS, returned from lunch, and noticed a little girl running between cars in the parking lot. The girl was also seen by the GCJFS receptionist. The girl was Callista, the Corey's five-year-old. At the time, Mrs. Corey explained that she had left Callista in the car with a nine-year-old friend, who then left the car to visit her mother at the Ravenwood Mental Health Clinic. Later, at the adjudicatory hearing, Mrs. Corey claimed she left Callista in the car with a sixteen-year-old girl named Kristy.
 {¶ 10} April 8, 2005, GCJFS filed its complaint, alleging that the Corey children were neglected, pursuant to R.C.2151.03(A)(3), and dependent, pursuant to R.C. 2151.04(C), both due to a failure of parental supervision, and requesting protective supervision. On April 15, 2005, the trial court held an initial hearing. The Coreys appeared, but did not plead; and on April 18, 2005, the trial court entered a pre-adjudicatory order, placing the Corey children under the protective supervision of the GCJFS, and adopting the case plan filed by the GCJFS. April 19, 2005, the trial court appointed a guardian ad litem. The Geauga County Public Defender appeared on behalf of the Coreys. At an April 28, 2005 pretrial, the Coreys entered a plea of "not true" to the complaint.
 {¶ 11} The adjudicatory and dispositional hearings were held June 8, 2005. By a judgment entry filed June 9, 2005, the trial court found the Corey children both neglected and dependent. Its dispositional order and the case plan included a provision that Mrs. Corey undergo mental health and psychiatric assessments. The Coreys timely appealed, making four assignments of error:
 {¶ 12} "[1.] The trial court erred by adjudicating the minor children neglected, pursuant to R.C. § 2151.03(A)(3), when that adjudication was not supported by sufficient evidence and was against the manifest weight of the evidence.
 {¶ 13} "[2.] The trial court erred by adjudicating the minor children dependent, pursuant to R.C. § 2151.04(C), when that adjudication was not supported by sufficient evidence and was against the manifest weight of the evidence.
 {¶ 14} "[3.] The trial court erred by refusing to admit evidence of the current situation.
 {¶ 15} "[4.] The trial court erred by imposing a disposition addressing a matter not alleged in the complaint and which was not supported by any evidence."
 {¶ 16} The standard of review in custody matters is abuse of discretion. Wyatt v. Wyatt, 11th Dist. No. 2004-P-0045,2005-Ohio-2365, at ¶ 12. "Abuse of discretion" is not mere error of law or judgment: it means the trial court's decision is unreasonable, arbitrary, or unconscionable. Id. An appellate court cannot substitute its judgment for that of the trial court. Id. at ¶ 13. Rather, it defers to the trial court's findings, since that court is able to view the witnesses and determine their credibility. Id. This is especially important in the sensitive and emotion-laden atmosphere of custody proceedings. See, e.g., id.
 {¶ 17} By their first two assignments of error, the Coreys attack the trial court's findings of neglect and dependency, as being against the manifest weight of the evidence. In civil cases, a manifest weight challenge will fail if some competent, credible evidence supports the judgment. In re M.M. (February 7, 2002), 8th Dist. No. 79947, 2002-Ohio-472, 2002 Ohio App. LEXIS 463, at 12. A reviewing court may consider not merely the sufficiency, but also the quality, of the evidence introduced. Id. at 12-13. Due to the importance of parental rights, "* * * to the extent the civil manifest-weight review is less demanding than that in criminal matters, in juvenile proceedings such review should more closely approximate the criminal standard." Id.
 {¶ 18} The trial court found the Corey children neglected pursuant to R.C. 2151.03(A)(3), due to failure of parental supervision. R.C. 2151.03(A)(3) provides that a child is neglected if his or her parent, guardian, or custodian fails to give "* * * proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being [.]" A charge of neglect must be proved by clear and convincing evidence. "Clear and convincing" evidence is that measure of proof greater than a "preponderance," yet less than "beyond a reasonable doubt," which produces in the mind of the trier of fact a firm belief or conviction in the facts sought to be established. In re Zeiser
(1999), 133 Ohio App.3d 338, 340-341.
 {¶ 19} The Coreys note that there is no evidence that any of their children are undernourished or not receiving medical care. Indeed, they argue that the evidence establishes that their children are generally happy and out-going, and developing at a normal pace. They argue that they have cooperated fully with the GCJFS, attending a parenting class, and applying the lessons learned successfully and even enthusiastically.
 {¶ 20} We agree that the record shows that the Coreys are doting parents, with bright, normal children. However, strange as it may sound to a layman's ear, this is beside the point regarding the trial court's finding of neglect. That finding was premised on a lack of parental supervision appropriate for infants and toddlers, such as the Corey children. The trial court found that the series of incidents observed by the hospital, Help Me Grow, and GCJFS personnel over a period of five to six weeks indicated that the Coreys simply did not understand the level of supervision necessary for such young children. These incidents included Mrs. Corey's varying stories as to how Curtis choked on the plastic wrapper; Mrs. Corey giving Curtis a plastic wrapper as a toy, while at the hospital to get a plastic wrapper removed from his throat; the Corey's insistence that their infant children knew better than to touch a hot stove; and, leaving Callista alone, or with another child, in the car at the GCJFS parking lot.
 {¶ 21} In the Zeiser case, this Court determined that insufficient parental supervision, alone, will support a finding of neglect. Id. at 347-350. We set forth three salient factors to be considered when determining if a lack of supervision is neglect. Id. at 347. These include: (1) the ages of the children; (2) "the pattern, regularity, and length of the incidents of no supervision;" and, (3) whether it appears that the lack of supervision will continue due to the inability or unwillingness of the parents to acknowledge the problem.
 {¶ 22} Application of these factors to the instant case supports the trial court's decision. At the time of the hearing, Curtis and Madison were infants, Callista only five. Common sense dictates that such children need closer supervision than children even a few years older. The incidents were generally not of long duration, but both pattern and regularity existed. Mrs. Corey gave Curtis a plastic wrapper with which to play, while he was in the hospital to have one removed from his throat. This shows pattern. As for regularity — a serious incident occurred on each of the three occasions the hospital, Help Me Grow, or GCJFS personnel first observed the children. Finally, and most significant, is the evidence that Mr. and Mrs. Corey seem unable to recognize the problem, which indicates that, without intervention, it will continue. Mrs. Corey gave Curtis inappropriate toys, immediately after he choked on one. The Coreys insisted that an eleven-month old recognizes the dangers of a red-hot stove.
 {¶ 23} The first assignment of error is without merit.
 {¶ 24} By their second assignment of error, the Coreys challenge the trial court's finding of dependency pursuant to R.C. 2151.04(C), which states that a child is dependent "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming his guardianship[.]" Like neglect, the state must establish dependency by clear and convincing evidence. In re Elliott, 11th Dist. No. 2005-A-0018,2006-Ohio-738, at ¶ 11. Whereas a finding of "neglect" is premised on parental conduct, a finding of dependency focuses solely on the child's condition and environment. Id. "However, the conduct of a parent is significant, insofar as it forms or may form part of the child's environment." Id.
 {¶ 25} The Corey children are very young. Callista is six, Madison, three, Curtis, two. For children this age, parents do not form "part" of the environment: they are the environment. Mr. and Mrs. Corey's difficulty in understanding the level of supervision appropriate for their children, and requisite for providing them a safe environment, was established by the testimony of the Rainbow personnel, the Help Me Grow worker, and the GCJFS personnel. This evidence, alone, is of sufficient quantity and quality to defeat any manifest weight challenge to the finding of dependency. Indeed, Mrs. Corey's own testimony, establishing that she lied to the GCJFS workers about who was with Callista at the time of the March 18, 2005 parking lot incident, undermines the Coreys' own assignment of error. Consequently, the second assignment of error is without merit.
 {¶ 26} By their third assignment of error, the Corey's argue that the trial court improperly sustained an objection to testimony by GCJFS social worker Danielle Coward concerning their successful completion of a parenting class. They cite to the decisions of the Ohio Supreme Court in In re Kronjaeger (1957),166 Ohio St. 172, and the Second District Court of Appeals, inIn re Minton (1960), 112 Ohio App. 361, for the proposition that evidence of conditions at the time of the adjudicatory hearing determines whether a child is neglected or dependent.
 {¶ 27} This Court is well aware of the conflict between those courts following the rule in Kronjaeger, and those relying on the 1969 statutory amendments for the proposition that findings of neglect and dependency should be determined as of the date or dates in the complaint. See In re S.H., 12th Dist. No. CA2005-01-007, 2005-Ohio-5047, at ¶¶ 8-12 (collecting cases). We need not reach the issue here. A trial court's evidentiary rulings may only be disturbed for abuse of discretion. Headleyv. Headley (Sept. 29, 2000), 11th Dist. No. 99-A-0049, 2000 Ohio App. LEXIS 4556, at 6. GCJFS objected to Ms. Coward's testimony regarding the parenting class attended by the Coreys on two bases: (1) that the Coreys' completion of the parenting class occurred after the date of the complaint; and, (2) that Ms. Coward's testimony constituted hearsay. The second basis for the objection was perfectly valid, as Ms. Coward did not supervise or attend the class with the Coreys, but merely talked with the teacher and the Coreys about the class.
 {¶ 28} Further, any error in this regard was harmless. Ms. Coward had virtually completed her testimony regarding the parenting class when the objection was raised, and no motion to strike her prior testimony was made. And, Mrs. Corey herself testified about her experience in the class.
 {¶ 29} The third assignment of error is without merit.
 {¶ 30} By their fourth assignment of error, the Coreys attack that part of the dispositional order requiring Mrs. Corey to undergo a mental health assessment, and making her compliance part of the case plan. The Coreys recognize the broad discretion exercised by juvenile courts in fashioning such orders. However, they note that R.C. 2151.412(D) mandates that the case plan be based on evidence presented at the dispositional hearing. They argue that Mrs. Corey's laywoman's self-description of being "obsessive-compulsive" about cleaning her house is the only "evidence" pertaining to a potential mental condition in the record. They argue that any restriction on the parent of a neglected or dependent child in protective supervision must be "reasonable." R.C 2151.353(A)(1) and (C). They argue that it is unreasonable to require Mrs. Corey to undergo a mental health assessment based on a description of her housekeeping habits.
 {¶ 31} Challenges to dispositions ordered by trial courts regarding abused, neglected and dependent children are reviewed for abuse of discretion. In re Allen, 5th Dist. No. 03CA08041,2004-Ohio-2911, at ¶ 40. When a court orders that a child be placed in protective supervision, it may place any reasonable restriction on that child's parent or guardian. R.C. 2151.353(C). In the instant case, Mrs. Corey's self-description of being "obsessive-compulsive" about cleaning her home was not the only evidence regarding her mental health. Ms. Kessler, the Rainbow social worked, noted Mrs. Corey's admission that Mr. Corey had asked her to stop obsessing with housecleaning. Certainly, a mother who cleans her home several times a day might very well be distracted from her infant children.
 {¶ 32} More significant was the evidence that Mrs. Corey was not entirely truthful. Evidence of this includes the various stories about how Curtis got the plastic wrapper in his throat on February 5, 2005, as well as the different accounts about who was with Callista in the GCJFS parking lot on March 18, 2005. GCJFS relied on these discrepancies in requesting that a mental health assessment of Mrs. Corey be included in the order and case plan. Further, there is evidence in the record that Mrs. Corey has suffered from bi-polar disorder, and possibly substance abuse.[2] Taken together, this was enough to justify the trial court's inclusion of a mental health assessment in its order. The fourth assignment of error is without merit.
 {¶ 33} The judgment of the Geauga County Court of Common Pleas, Juvenile Division, is affirmed.
O'Neill, J., Rice, J., concur.
[1] The house has since been purchased by Mr. Corey's employer, and improved considerably.
[2] The trial court's comments on these issues appear in the transcript of the June 8, 2005 hearing. Evidently, these may have been matters in the guardian ad litem's report, which is not before us.