OPINION
{¶ 1} Appellant, Trumbull County Children's Services Board ("TCCSB"), appeals from the judgment of the Trumbull County Court of Common Pleas, Domestic Relations Division, adopting the Magistrate's Decision and Order, vacating the prior order granting TCCSB temporary custody of the minor children, Leonard and Nathaniel Veccia, and returning custody to the parents (appellees). We affirm the judgment of the lower court.
 {¶ 2} On May 20, 2005, Nathaniel was referred to Rainbow Babies and Children's Hospital ("Rainbow") in Cleveland, Ohio, where he was admitted for the purpose of investigating and determining the cause behind his enlarged head circumference. Testimony adduced at the hearing indicated that Dr. Jennifer Williams-Reed, the children's primary care physician, had referred Nathaniel to Dr. Goyal for this condition. It was unclear from the testimony whether Nathaniel had been referred to Rainbow by Dr. Goyal or Dr. Williams-Reed.
 {¶ 3} Results of a CT scan and an MRI on Nathaniel's head at the time of his admission to Rainbow revealed that he had "bilateral subdural fluid collections," which appeared, "to be of different ages," according to the testimony of Dr. Lolita McDavid, the Medical Director of Child Advocacy and Protection at Rainbow, who performed a consult on Nathaniel's case on May 23, 2005.
 {¶ 4} On May 31, 2005, TCCSB filed a complaint to have Leonard, age one year, ten months and Nathaniel, age nine months, adjudicated abused and/or dependent children, pursuant to R.C.2151.031(C) and R.C. 2151.04(C), respectively. The complaint alleged that Nathan's diagnosis by Rainbow physicians, was "bilateral subdural hematomas and moderate brain atrophy," which were the "result of non-accidental trauma."
 {¶ 5} With respect to Leonard, the complaint alleged that he was previously admitted to Rainbow on February 23, 2004, where he was diagnosed for failure to thrive, with bruising and a fracture to his left tibia.[1]
 {¶ 6} The complaint acknowledged that, on May 25, 2005, both parents signed a voluntary agreement granting TCCSB temporary custody of the children, who were subsequently placed into foster care.
 {¶ 7} Along with the complaint, TCCSB also filed a motion for appointment of a guardian ad litem, which was granted.
 {¶ 8} At the first adjudicatory hearing held on June 16, 2005, testimony was taken from Dr. Williams-Reed. During this hearing, the parents withdrew their voluntary consents to temporary custody. TCCSB filed an immediate Motion for Ex-Parte Custody, which was granted.
 {¶ 9} A shelter care hearing was held on June 17, 2005. As the result of this hearing, the magistrate found probable cause for the complaint, and formally granted temporary custody to TCCSB, pending further hearings. The magistrate further directed that the depositions of all treating physicians were to be taken and submitted by July 20, 2005. The magistrate also ordered that results of certain tests listed in the ex-parte order were to be made available to respective counsel and the guardian ad litem. The trial court adopted the magistrate's orders in full on July 8, 2005.
 {¶ 10} An adjudicatory hearing began on July 20, 2005, at which TCCSB offered the testimony of Dr. McDavid. The matter was set for further hearing on August 26 and September 12, 2005, but was rescheduled pursuant to a motion for continuance filed by appellees.[2]
 {¶ 11} On July 23, 2005, TCCSB filed a motion to extend time for the taking of depositions, stating that there was insufficient time to conduct the depositions and to obtain and circulate the test results referred to in the ex-parte order. Although the trial court never filed a judgment entry related to this motion, it is clear from the record that no depositions were ever taken or filed with the court, despite the trial court's adoption of the magistrate's order.
 {¶ 12} On September 22, 2005, appellees filed a motion to dismiss, on the basis that the case had not been adjudicated or disposed of within the jurisdictional time requirements.
 {¶ 13} The adjudicatory hearing resumed on October 26 and 27, 2005. At the start of the hearing, appellees orally renewed their motion to dismiss. The trial court noted, at the time, that the appellees had earlier requested a motion for continuance, which had been granted, and thus, went forward with the hearing.
 {¶ 14} At the hearing, TCCSB presented testimony from Elizabeth Lewis, the TCCSB caseworker initially assigned to the matter, Dr. McDavid, and appellees. TCCSB did not present testimony from any of the other doctors who had been involved in the case, despite the fact that the magistrate made it clear that their testimony related to any tests performed and diagnoses made would be required.
 {¶ 15} At the close of the hearing, TCCSB orally moved for a continuance until such time as the records could be obtained. Appellees again renewed their motion to dismiss at the close of evidence.
 {¶ 16} On November 1, 2005, the magistrate issued an order vacating TCCSB's custody of the children, and returned custody to appellees. On November 9, 2005, TCCSB filed objections to the magistrate's decision, along with a motion to set aside the magistrate's order.
 {¶ 17} On November 14, 2005, the trial court entered judgment adopting the magistrate's decision in full. It is from this judgment that TCCSB timely appeals, assigning the following as error:
 {¶ 18} "[1.] THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN REQUIRING EVIDENCE OF PARENTAL FAULT FOR A COMPLAINT ALLEGING ABUSE OR DEPENDENCY DURING THE ADJUDICATORY HEARING.
 {¶ 19} "[2.] THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN REQUIRING A DOCTOR TO TESTIFY THAT THE MINOR CHILDREN ARE DEPENDENT, NEGLECTED OR ABUSED.
 {¶ 20} "[3.] THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILIED TO GRANT APPELLANT'S MOTION FOR A CONTINUANCE SO THAT THE HOSPITAL MEDICAL RECORDS COULD BE INTRODUCED AS EVIDENCE.
 {¶ 21} "[4.] THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY CONSIDERING DISPOSITIONAL MATTERS DURING THE ADJUDICATORY PHASE OF HEARING."
 {¶ 22} Since appellant's first and second assignments of error are related, they will be discussed together.
 {¶ 23} In its first assignment of error, TCCSB argues that the trial court erred, contrary to the express terms of R.C.2151.031(C), by requiring evidence of parental fault as a prerequisite to finding Nathaniel and Leonard were abused or dependent.
 {¶ 24} In its second assigned error, TCCSB argues that the trial court erred by requiring that a doctor testify that Nathaniel had been abused, since the statute does not require testimony as to the precise mechanism of the injury be given before a child is adjudicated abused under R.C. 2151.031(C).
 {¶ 25} In the instant matter, TCCSB brought the action to declare Nathaniel an abused child under R.C. 2151.031(C), which defines an abused child as one who "[e]xhibits evidence of any physical * * * injury * * *, inflicted other than by accidental means, or an injury * * * which is at variance with the history given of it."
 {¶ 26} As appellant correctly points out in its first assignment of error, and appellees concede, "[t]he plain language of R.C. 2151.031(C) clearly indicates that parental fault is not required for a finding of abuse." In re Anthony, 11th Dist. No. 2002-A-0096, 2003-Ohio-5712, at ¶ 18, citing In re Pitts
(1987), 38 Ohio App.3d 1, 5.
 {¶ 27} Appellees argue, however, that the magistrate's references to "parental fault" or "parental unfitness or unsuitability" in his findings of fact, do not automatically render a conclusion that the magistrate required this element to be proven in order to declare Nathaniel an abused child. Appellees, instead argue that any references made to parental "fault" in the magistrate's decision were, at most, harmless error, since the magistrate's conclusion was that there was insufficient evidence presented to demonstrate the essential elements of abuse required by the statute.
 {¶ 28} In its second assigned error, appellant argues that R.C. 2151.031(C) creates no requirement that a physician testify that the child was abused, since the statute provides protection when the precise mechanism of injury is unknown or unknowable. Again, appellees do not take issue with this point, but instead argue that appellant has, on the basis of the testimony and evidence provided, failed to demonstrate that Nathaniel's condition was due to "injuries inflicted other than by accidental means." (Emphasis added). We agree.
 {¶ 29} In order to address the merits of the respective arguments, we must determine, as a threshold issue, whether appellant has satisfied its burden of proof as to all theessential elements of abuse, as defined by R.C. 2151.031(C).
 {¶ 30} "In an adjudicatory hearing regarding a claim of dependency, neglect and/or abuse, the requisite burden of proof is by clear and convincing evidence." Anthony, 2003-Ohio-5712, at ¶ 16, citing Juv.R. 29(E)(4).
 {¶ 31} "Clear and convincing evidence is that measure or degree of proof which is more than a mere `preponderance of the evidence,' * * * and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, at paragraph three of the syllabus. The state, as the party seeking the adjudication, "has the burden of establishing * * * that a child is abused or neglected before the court may enter a finding of abuse or dependency." In re Stewart (Mar. 20, 2000), 12th Dist. No. CA99-08-024, 2000 Ohio App. LEXIS 1068, at *7-*8. "Requiring the state to prove its case by clear and convincing evidence is part of the protection afforded to parents in abuse and dependency cases." Id. at *9.
 {¶ 32} Whether the party with the burden of proof has met the applicable standard is determined by "the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself." Cross,161 Ohio St. at 477-478.
 {¶ 33} A plain reading of the R.C. 2151.031(C) indicates that in order to prove Nathaniel was an abused child, TCCSB must show, by clear and convincing evidence, that Nathaniel (1) exhibited evidence of any physical injury, and that the injury was either (2) inflicted other than by accidental means, or (3) was at variance with the history given of the injury.
 {¶ 34} A review of the relevant statutory definitions shows no definition for the word injury. Thus, we are to ascribe the plain and ordinary meaning of the words used, "unless legislative intent indicates otherwise." Stenglein v. Nelson, 11th Dist. No. 2003-P-0004, 2003-Ohio-5709, at ¶ 13, citing CoventryTowers, Inc. v. Strongsville (1985), 18 Ohio St.3d 120, 122.
 {¶ 35} "Injury" is thus defined as "[a] wrong or damage done to a person * * * when caused by the wrongful act of another."Webster's II New College Dictionary (3 Ed. 2005) 585 (emphasis added).
 {¶ 36} As stated earlier, no finding of parental fault is required. "All that is necessary is that the child be a victim,
regardless of who is responsible for the abuse. The focus is onharm to the child, not upon parental or custodial blame-worthiness." Pitts, 38 Ohio App.3d at 5 (emphasis added). Put most simply, the burden on TCCSB is to demonstrate, by clear and convincing evidence, that the child's condition was the result of some demonstrable harm to the child, rather than the condition being due to some other cause.
 {¶ 37} In the instant matter, Dr. Williams-Reed testified on behalf of appellees and Dr. McDavid testified on behalf of the appellants as expert witnesses.
 {¶ 38} As this court has stated, "[a]djudicatory hearings require compliance with the Ohio Rules of Evidence." Anthony,2003-Ohio-5712, at ¶ 25. citing In re Ranker (Oct. 6, 2000), 11th Dist. No. 99-P-0072, 2000 Ohio App. LEXIS 4662, at *30-*31.
 {¶ 39} Moreover, it is well-settled that matters related to the admission or exclusion of evidence is within the sound discretion of the trial court and will not be reversed absent a showing that the trial court abused its discretion. State v.Sage (1987), 31 Ohio St.3d 173, at paragraph two of the syllabus. An abuse of discretion consists of more than an error of law or judgment. Rather, it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Berk v. Matthews
(1990), 53 Ohio St.3d 161, 169 (citation omitted).
 {¶ 40} With regard to expert testimony, Evid.R. 703, which governs the basis of the expert's opinion testimony, states that "[t]he facts and data * * * upon which an expert bases an opinion or inference may be those perceived by him or admitted inevidence at the hearing." (Emphasis added).
 {¶ 41} Evid.R. 705 states that an "expert may testify in terms of opinion and give his reasons therefore after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."
 {¶ 42} "It is a general rule that the expert witness is not required to be the best witness on the subject * * *. The test is whether a particular witness offered as an expert will aid the trier of fact in the search for the truth." Alexander v. Mt.Carmel Medical Ctr. (1978), 56 Ohio St.2d 155, 159 (citations omitted).
 {¶ 43} However, it is equally well-settled, with respect to medical opinion testimony, that such testimony "be based upon a reasonable degree of medical certainty or probability." State v.Simpson (Sept. 30, 1994), 11th Dist. No. 93-L-014, 1994 Ohio App. LEXIS 4472, at *21, citing Shumaker v. Oliver B. Cannon Sons, Inc. (1986), 28 Ohio St.3d 367, 374; State v. Harrison
(May 12, 1993), 1st Dist. No. C-920422, 1993 Ohio App. LEXIS 2446, at *5 (citations omitted); but cf. State v. Allen (May 25, 1994), 1st Dist. Nos. C-930159, C-930160, 1994 Ohio App. LEXIS 2239, at *17-*18 (opinions of physicians as to cause of death, based upon their observations during the course of treatment or post-mortem examination, need not be stated to a reasonable degree of medical certainty).
 {¶ 44} As stated earlier, with regard to expert testimony, Evid.R. 703 states "[t]he facts and data * * * upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." As is plain from the language of the rule, the expert may testify as to their own observations that arise from examination of the patient. SeeReinhardt v. Univ. of Cincinnati Med. Ctr. (Dec. 13, 1994), 10th Dist. No. 94API04-603, 1994 Ohio App. LEXIS 5554, at *7. However, with regard to testimony which also relates to medical reports and records not admitted into evidence, the Supreme Court of Ohio held that under Evid.R. 703, it is "error to admit * * * expert opinion testimony based on medical reports and records which were not prepared by expert witnesses." State v. Jones
(1984), 9 Ohio St.3d 123, 125.
 {¶ 45} The Supreme Court of Ohio later distinguished the rule of Jones on the basis of whether the expert had personally examined the patient and held that "where an expert basis his opinion, in whole or major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied." Statev. Solomon (1991), 59 Ohio St.3d 124, 126 (emphasis added).
 {¶ 46} With respect to the basis of her knowledge of the case, the testimony of Dr. McDavid on July 20, 2005, was as follows:
 {¶ 47} "Q: Can you tell us how Nathaniel came to the hospital?
 {¶ 48} "A: According to my note, he was admitted for an enlarged head circumference, meaning head size.
 {¶ 49} "Q: And do you know who caused him to come to the hospital?
 {¶ 50} "A: According to my note, his —
 {¶ 51} "Mr. Rossi: Objection, providing the doctor is not testifying from somebody else's notes.
 {¶ 52} "The Witness: I'm reading from my note.
 {¶ 53} "The Court: Overruled.
 {¶ 54} "A: His primary medical physician, Dr. Jennifer Williams-Reed, at the Evans Middlefield Medical Clinic had referred him to Dr. Goyal, * * * because of increasing head circumference. At some point after that, he came to Rainbow. I am not sure exactly who referred him to Rainbow, whether it was Dr. Williams-Reed or Dr. Goyal.
 {¶ 55} "Q: Was there a provisional or initial diagnosis made of him when he came to the hospital?
 {¶ 56} "A: He had on — and this is from my note — on the CT scan — on the MRI of his head he had bilateral subdural fluid collections. So he had extra fluid that would not be expected on his head. That was on May 20th.
 {¶ 57} "Q: Would Rainbow have wanted to look into those subdural collections of fluid?
 {¶ 58} "A: Yes.
 {¶ 59} "Q: And did Rainbow make any investigation or take any tests to try and determine what was going on in this young boy's head?
 {¶ 60} "* * *
 {¶ 61} "A: Yes.
 {¶ 62} "Q: What was determined from the tests that were taken?
 {¶ 63} "The Court: First of all, we need to know within reasonable medical certainty.
 {¶ 64} "Mr. Neuman: We do. I was going to ask that question at the end of her testimony.
 {¶ 65} "Q: Doctor I'd like you to testify within a reasonable degree of medical certainty today in making your testimony. Is that acceptable to you?
 {¶ 66} "A: Yes.
 {¶ 67} "Q: And will you do that?
 {¶ 68} "A: Yes. I saw the child on May the 23rd. There were tests that were done after I saw him. So after my consult goes into the chart, I don't follow him as one of the primary caregivers. So I have to speak to what is in his chart * * * from other physicians.
 {¶ 69} "Q: Did you take those findings into consideration when they were available and when you did your own personal examination of the child?
 {¶ 70} "A: Yes.
 {¶ 71} "Q: And if there were tests that were yet to be completed, would you have also — would you also rely on those test findings?
 {¶ 72} "A: Yes. But I did not do another note in this child's chart after my initial note, although I did follow along with the physicians who were caring for the child."
 {¶ 73} Later, when asked about the appearance of Nathaniel's subdural hematomas, and whether there was an indication whether they occurred simultaneously or at different times, Dr. McDavid testified as to the following tentative hypothesis, based upon the notes of Dr. Bass, the neurologist: "This is Dr. Bass's note * * * I'm going to read directly. A nine-month old with bilateral subdural hematomas that appear of different ages. This is suspect of nonaccidental trauma. So far the rest of the workup has been negative. Metabolic studies still pending * * *." According to Dr. McDavid's testimony, Dr. Bass' notes were placed into the files on May 24, 2005, which was after Dr. McDavid had placed her own notes into the chart.
 {¶ 74} With respect to other possible causes considered for Nathaniel's condition, Dr. McDavid read from the genetics note of Dr. Warman, which stated, in relevant part, as follows: "I did not recognize a likely genetic/metabolic cause for Nate's findings. There is no evidence of a bleeding disorder, a neurodegenerative disease, or a connective tissue disease. I agree that GA-1 — which is glutaric acidemia * * * — must be considered in the differential diagnosis. But the pattern of MRI findings * * * are very atypical for this metabolic disease. It is theoretically possible that Nate may have a subtle degenerative neurologic disease that reduced brain size, put tension on the bridging veins, and led to subdural hemorrhage. Were this to be the case I would expect Nate to show continued deterioration with time. * * * I agree that it is important to consider a traumatic etiology even though there is no evidence of retinal hemorrhage of CNS gliosis secondary to trauma. * * * I agree with looking for possible metabolic disease such as gultaric aciduria Type 1. * * * [I]f metabolic tests are normal, we or neurology can follow Nate as an outpatient for signs of progressive deterioration."
 {¶ 75} Later, referring to the discharge diagnosis, also performed by Dr. Bass, Dr. McDavid testified as follows: "His principal diagnosis was traumatic subdural hematoma and then he had other diagnoses."
 {¶ 76} When asked whether, after all the tests and consults were done, there was a way to describe Nathaniel's condition in terms of whether or not he had suffered a nonaccidental injury, Dr. McDavid, opined as follows:
 {¶ 77} "He had something happen, because when we look at his head circumferences they were normal, and then there was a point when they took off. When you look at the MRI, there's collections [sic] of different ages. An MRI is more definitive than a CT scan in whether or not telling you fluids were of different ages. * * * Because I am not a neurologist or neurosurgeon, I don't make their diagnoses, although I can extract from their notes in the chart."
 {¶ 78} Following objection, which the court sustained on the basis that Dr. Bass' testimony would be necessary with respect to the diagnosis, Dr. McDavid read the following from the summaries of diagnosing physicians: "Dr. Villella * * *: Bilateral subdural hematoma, subacute, suspicious for nonaccidental trauma. * * * Further workup, however, is required to determine the etiology of abnormal clotting studies. * * * Due today. Follow-up in Ireland Cancer Center."
 {¶ 79} From a neurosurgery note, written by Dr. Shenandoah Robinson and dated May 25, 2005:
 {¶ 80} "Bilateral subdural hematomas of different ages and no other reasonable explanation at this time. His genetic workup is still pending, but glutaric aciduria is quite unlikely given his lack of other symptoms or basal ganglia findings on the MRI. Nonaccidental trauma is the most likely diagnosis."
 {¶ 81} Near the close of testimony, the following exchange took place:
 {¶ 82} "The Court: Can we say with reasonable medical certainty that there was a trauma that caused this?
 {¶ 83} "The Witness: Without any other explanation, that was what the neurosurgeon and the neurologists were concerned about.
 {¶ 84} "The Court: Can we say from the information you have that we don't have genetic proof, at least from the tests we've taken?
 {¶ 85} "The Witness: Not from what's in the file.
 {¶ 86} "The Court: Now there may be something else later?
 {¶ 87} "The Witness: Yes."
 {¶ 88} On October 26 and 27, 2005. the trial court took further testimony from Dr. McDavid regarding the results of certain lab work which had not been completed at the time of the earlier hearing.
 {¶ 89} Near the close of testimony, when asked whether she could, with a reasonable degree of medical certainty, say that Nathaniel had been abused, Dr. McDavid, relying on the discharge diagnosis prepared by Dr. Bass stated that "[t]his case is highly suspicious for inflicted injury."
 {¶ 90} Under the circumstances presented herein, we conclude that Dr. McDavid's testimony was not based, in whole, or major part, on facts perceived by her.
 {¶ 91} As is evident from the foregoing colloquy, Dr. McDavid relied heavily on the reports prepared by other Rainbow physicians in reaching her conclusion, in particular the testimony of the neurologist, Dr. Bass, and the neurosurgeon, Dr. Robinson, which were completed after Dr. McDavid conducted her own examination. TCCSB recognized, as evident by its request for a continuance of the adjudicatory hearing, that, at a minimum, the testimony of the two aforementioned doctors would be required to establish a foundation for Dr. McDavid's opinion testimony based upon their reports. Moreover, the record was completely devoid of any evidence based directly upon Dr. McDavid's own examination of Nathaniel which would lead a reasonable finder of fact to conclude that Nathaniel's condition was the result of a non-accidental injury.
 {¶ 92} Under these circumstances, the trial court did not err by requiring the testimony of these doctors.
 {¶ 93} Even if the aforementioned testimony had been properly admitted, Dr. McDavid's testimony, standing alone, does not satisfy the standard of reasonable medical certainty. As noted earlier, when asked whether she could, with a reasonable degree of medical certainty, testify that Nathaniel's injuries were the result of abuse, Dr. McDavid replied, "[t]his case is highly suspicious for inflicted injury."
 {¶ 94} Suspicion is defined as "[t]he apprehension of the existence of something wrong based only on * * * inconclusive evidence." Black's Law Dictionary (8 Ed. 2004) 1487. This does not meet the standard for an expert medical opinion which is "competent only if it is held to a reasonable degree of scientific certainty." State v. Benner (1988),40 Ohio St.3d 301, 313.
 {¶ 95} After reviewing the testimony adduced at trial, including that of Dr. McDavid and of Dr. Williams-Reed, Nathaniel's primary care physician, who had testified that she had seen no obvious signs of abuse, the magistrate reached the following conclusion:
 {¶ 96} "By the standard of clear and convincing evidence, nomedical testimony was presented that with reasonable medicalcertainty that NATHANIEL suffered non-accidental trauma as theresult of abuse; that the trauma was caused by the negligent orpurposeful acts of the parents, or that the parents allowed theabuse by omission of a duty to protect rendering them unfit orunsuitable for custody and care of their children."
 {¶ 97} We cannot conclude, on the basis of the record before us, that the magistrate erred by concluding that TCCSB failed to establish, by clear and convincing evidence, that Nathaniel exhibited evidence of any physical injury.
 {¶ 98} Since TCCSB failed, as a matter of law, to prove this first element of abuse, any references to "parental fault" in the magistrate's opinion were, at most, harmless error. With respect to TCCSB's argument that the trial court required Dr. McDavid to testify that Nathaniel had been "abused," we find no evidence in the record to support such a conclusion.
 {¶ 99} TCCSB's first and second assignments of error are without merit.
 {¶ 100} Relying on In re Baby Girl Baxter (1985),17 Ohio St.3d 229, at paragraph one of the syllabus, which held that "[i]n proceedings where parental rights are subject to termination, both the Juvenile Rules and the Revised Code prescribe that such proceedings be bifurcated into separate adjudicatory and dispositional hearings," TCCSB argues, in its fourth assignment of error, that the trial court committed reversible error by mingling adjudicational and dispositional issues when it requested a proposed Protective Supervision Order for the court's consideration during the adjudicatory phase of the hearing. We disagree.
 {¶ 101} R.C. 2151.35 governs hearing procedures in the juvenile court and provides, in relevant part as follows: "If
the court at the adjudicatory hearing finds from clear and convincing evidence that the child is an abused, neglected, or dependent child, the court shall proceed, in accordance with division (B) of this section, to hold a dispositional hearing and hear the evidence as to the proper disposition to be made under section 2151.353 of the Revised Code." R.C. 2151.35(A)(1) (emphasis added).
 {¶ 102} "[T]he law requires the proceedings in such a case to be bifurcated into separate adjudicatory and dispositional hearings because the issues raised and the procedures used at each hearing differ." Pitts, 38 Ohio App.3d at 4. The focus in the dispositional hearing is on the best interest of the child. Juv.R. 34.
 {¶ 103} TCCSB alleges that, during a recess from the October 27, 2005 dispositional hearing, the trial court requested a Proposed Protective Supervision Order, which TCCSB filed with the court later that day. Although the record does not contain a record of the in camera discussion leading to the submission of this order, the magistrate's decision states as follows:
 {¶ 104} "When a Protective Supervision Order (PSO) was discussed as an alternative to a contested trial, TCCSB submitted a letter from Dr. David J. Santoserra MD faxed 10/25/05 which states: `While I cannot prove this in court, it is my strong belief . . . ` and then he states his concern. The precise place that abuse MUST be proven IS court * * *."
 {¶ 105} The plain language of the magistrate's decision indicates that rather than being submitted for dispositional issues, the PSO was being considered as an alternative to acontested trial. There is no indication the trial court requested the PSO in contemplation of a dispositional hearing.
 {¶ 106} Furthermore, while the letter from Dr. Santoserra, of May 25, 2005, was attached to the PSO and contained the medical reasoning behind his opinion as to why he did not believe the children "being at home with their biological parents is in their best interest," the presence of language alone does not lead to the inevitable conclusion that the magistrate considered the letter for the purpose of disposition.
 {¶ 107} Finally, even if the magistrate's consideration of Dr. Santoserra's letter was error, it was, at most, harmless for the reasons stated in our discussion of TCCSB's first and second assignments of error.
 {¶ 108} TCCSB's fourth assignment of error is without merit.
 {¶ 109} In its third assignment of error, TCCSB contends that the trial court erred by not granting a continuance to secure the medical records or to secure the testimony of the various treating physicians.
 {¶ 110} It is well-settled that "[t]he grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial [court]." State v. Unger (1981),67 Ohio St.2d 65, 67. "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly the reasons presented to the trial judge at the time the request is denied." Id. quoting Ungar v.Sarafite (1964), 376 U.S. 575, 589. Juv.R. 23 provides that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties."
 {¶ 111} The Ohio Supreme Court has adopted a balancing test in evaluating the whether a motion for continuance was properly denied, in which the court should note (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) inconvenience to litigants, witnesses, opposing counsel and the court; (4) whether the delay requested is for legitimate reasons or whether it is dilatory, purposeful or contrived; (5) whether the defendant contributed to the circumstance that gives rise to the request for continuance, and (6) any other relevant factors. Id. at 67-68 (emphasis added).
 {¶ 112} A careful examination of the record leads us to conclude that the trial court did not abuse its discretion in refusing to grant TCCSB a continuance.
 {¶ 113} Although appellees requested and were granted a continuance from August 26, 2005 until October 26, 2005, TCCSB was aware, at least as early as the second day of the adjudicatory hearing, July 17, 2005, that it would need to secure medical records from Rainbow. TCCSB could provide no explanation as to why it had been unable to do so within the almost four month period between July and the end of October, despite the testimony of Elizabeth Lewis, the caseworker initially assigned to the case, that she had received at least some of the medical records "by calling the hospital directly."
 {¶ 114} Moreover, the magistrate's order of June 17, 2005, ordered that depositions of all treating physicians were to be completed and submitted to the court by July 20, 2005. While the record reveals that TCCSB moved for an order to extend the time for the filing of these depositions, there is no evidence that these depositions were ever taken, nor is there any explanation as to why TCCSB had failed to comply with this order.
 {¶ 115} We also find it significant that TCCSB waited to request the continuance until the end of the final day of the adjudicatory hearing. Though TCCSB avers in their appellate brief that the records were assembled and became available approximately six days after the conclusion of the hearing, the record indicates that TCCSB did not ask the trial court for any specific amount of time it might consider reasonable for obtaining the necessary records and testimony. See State v.Powell (1990), 49 Ohio St.3d 255, 259 (Whether a trial court abuses its discretion in granting or denying a continuance is dependent only on the reasons presented to the trial judge atthe time the request is denied. Any later suggestion that a delay would have been minimal is irrelevant when a party does not, at the time the continuance is requested, "ask the court for any specific amount of time.")
 {¶ 116} Balancing these factors against the fact that the children had been away from their parents for almost five months and that the evidence, as presented, failed to establish to a reasonable degree of medical certainty that Nathaniel's condition was caused by a non-accidental injury, we cannot conclude that the trial court abused its discretion by refusing to grant a further continuance.
 {¶ 117} TCCSB's third assignment of error is without merit.
 {¶ 118} For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas is affirmed.
William M. O'Neill, J., Cynthia Westcott Rice, J., concur.
[1] This allegation was based upon a summary which was prepared for TCCSB by the Portage County Children's Services Division and attached to TCCSB's Ex Parte Motion for Temporary Custody. The report stated that "[p]hysical abuse was substantiated," based upon the Portage CSB's reasoning that "the bruises were in areas normally used for disciplinary actions and the fact that no new [b]ruising occurred while at [Rainbow]," yet "[i]t was the decision of the Portage County Prosecutor to file a Motion to Dismiss this complaint against the recommendations of PCDJFS. The Prosecutor consulted with medical professionals, reviewed medical records, and felt there were no legal grounds to support a finding of dependency, neglect or abuse regarding Leonard. Portage County Juvenile Court dismissed the matter without prejudice and the case was closed 7-7-04." Although there was some testimony related to the Portage County report at the adjudicatory hearing, the report was never admitted into evidence.
[2] The trial court's judgment entry, entered on the record on August 29, 2005 did not expressly set a date for continuing the adjudicatory hearing, instead stating as follows: "As the continuance is beyond the statutory times, jurisdiction reserved under In re Young (1996), 76 Ohio St.3d 632." However, the record indicates that the relevant parties were served notice, via certified mail sent on August 24, 2005, that the hearings were to continue on October 26, 2005.