**In re SAVCHUK CHILDREN.**

[Cite as *In re Savchuk Children,* 180 Ohio App.3d 349, 2008-Ohio-6877.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

Nos. 2007–L–202, 2007–L–203, 2007–L–204, 2007–L–205, 2007–L–206 and 2007–L–207.

Decided Dec. 26, 2008.

Barthol & Staley, L.P.A., and Anita A. Staley, for appellant Teresa D. Palkovic.

Carl P. Kasunic Co., L.P.A., and Matthew W. Weeks, for appellant Andrew C. Savchuk.

Charles E. Coulson, Lake County Prosecuting Attorney, and Teri R. Daniel, Assistant Prosecuting Attorney, for appellee, Lake County Department of Job and Family Services.

Karen D. Lawson Co., L.P.A., and Karen D. Lawson, guardian ad litem.

CYNTHIA WESTCOTT RICE, Judge.

{¶ 1} Teresa Palkovic and Andrew Savchuk appeal from the judgment of the Lake County Court of Common Pleas, Juvenile Division, adjudicating their son, Jordan Savchuk, to be abused and their daughters, Jillian and Jayden Savchuk, to be dependent. We affirm.

{¶ 2} Teresa lives in Madison, Ohio, with her fiancé, Andrew, and their three children, Jillian, born September 19, 2002; Jayden, born July 3, 2005; and Jordan, born March 2, 2007. On Sunday, June 3, 2007, Teresa was nursing Jordan, when she felt an abnormality on the back of his head. Andrew agreed. They speculated that it might be caused by Jordan's favoring one side of his head as he slept, since Teresa's maternal nephew had experienced a similar problem. On Monday, June 4, 2007, Teresa met her sister and mother for lunch at a restaurant in Willoughby. Teresa's sister was concerned by the abnormality at the back of Jordan's skull. As a result, Teresa immediately took her son to a local pediatrician, who advised her to go to the emergency room at Lake West Hospital. Following an x-ray and CT scan of Jordan's skull, the Lake West doctors advised Teresa to take Jordan to Rainbow Babies and Children's Hospital for expert evaluation.

{¶ 3} At Rainbow, it was determined that Jordan had a skull fracture, a small fracture of the right femur, and multiple rib fractures. Officials at Rainbow contacted the Lake County Department of Job and Family Services ("LCDJFS"), which sent intake worker Gina Gaglione to the hospital. Before going, Ms. Gaglione contacted the Madison Township Police Department, which sent Detective John Doyle and Assistant Chief Glen DelCalzo to join her.

{¶ 4} Andrew joined Teresa at Rainbow, and Ms. Gaglione, Det. Doyle, and Assistant Chief DelCalzo questioned them as to possible causes for Jordan's injuries. They testified that Teresa was cooperative, concerned, and emotionally appropriate, but that Andrew was fidgety and overly emotional, frequently crying, and unable to answer questions. They discovered that Teresa had left Jordan in Andrew's care for several hours on Saturday, June 3, prior to her noticing the abnormality on Jordan's skull, and that all three children had been in his sole care for several hours that evening.

{¶ 5} Teresa gave several potential explanations for Jordan's injuries. She noted the possibility that Jillian, his eldest sister, may have jumped on him while he was in his "bouncy chair." She further noted that her mother, who suffers from mild dementia and who had a stroke disabling her right arm, might have dropped the baby while holding him. Ms. Gaglione and the police officers never inquired about the possibility of injuries caused by Jordan's difficult delivery. Teresa also told an attending physician that Andrew had been working very hard

recently and was quite tired. She consequently speculated whether something may have happened while the two were alone the previous weekend. The record reveals that Teresa described Andrew as a "rough guy" with a temper. Teresa had also spoken with Andrew about being too rough with Jordan.

{¶ 6} Ms. Gaglione had Jordan's sisters x-rayed for injuries. None were indicated, either by their x-rays or their medical records. With the help of the police, Ms. Gaglione took shelter care of the Savchuk children.

{¶ 7} Teresa and Andrew allowed Det. Doyle and Assistant Chief DelCalzo to inspect their home. The officers noted that Teresa and Andrew had taken measures to make the house safe for young children.

{¶ 8} On August 16, 2007, LCDJFS filed a complaint seeking to have Jordan adjudicated an abused child and Jillian and Jayden adjudicated dependent children.[1] That same day, the trial court granted LCDJFS temporary custody of the Savchuk children, appointed counsel for Teresa and Andrew, and appointed a guardian ad litem for the children. On August 22, 2007, Teresa moved that Jordan be clinically evaluated by Dr. Michael Levine of the Pediatric Endocrinology Department at the Cleveland Clinic. The state acquiesced, and the evaluation was done. On September 12, 2007, Teresa and Andrew moved to have Dr. Kathy Keller appointed their expert, at state expense. The trial court granted this motion.

{¶ 9} The parties exchanged discovery, including witness and exhibit lists on each side. On October 9, 2007, Teresa supplemented her witness and exhibit list with Dr. Patrick Barnes and his report relating to Jordan's head trauma. Trial commenced on October 10, 2007. On October 12, 2007, the state moved to supplement its witness and exhibit lists with Dr. Levine and his report. Teresa opposed. The trial court excluded Dr. Levine's report, but allowed his testimony.

{¶ 10} Trial occurred over several days between October 10, 2007, and October 26, 2007. In addition to Teresa, Ms. Gaglione, Det. Doyle, and Assistant Chief DelCalzo, the parties placed the testimony of five physicians on the record.

{¶ 11} Dr. Lolita McDavid, a professor of pediatric medicine and Medical Director of Child Advocacy and Protection at Rainbow, testified for the state. She stated that she found that Jordan had a "mildly displaced fracture of the occipital bone with soft tissue swelling noted posterior to the fracture" and "multiple bilateral rib fractures," "including right fifth and six lateral rib, fourth fifth, sixth lateral rib, and multiple bilateral rib fractures on the fifth and sixth posterior rib." Dr. McDavid testified that these injuries were consistent with squeezing. She opined that the injuries were sustained at different times. She

---

1. Evidently, the case had been previously filed, then dismissed.

did not believe that the skull fracture could be a result of birth trauma, three months after the event. She opined that Jordan's injuries could not have been caused by his sister jumping on him in his bouncy chair and that there were no signs of bone disease, such as rickets or osteogenesis imperfecta. She considered Jordan's injuries consistent with child abuse, given the nature of the injuries and the lack of explanation.

{¶ 12} Also testifying for the state was Dr. Carlos Sivit, Director of Pediatric Radiology at Rainbow. Dr. Sivit testified that he reviews between 16,000 and 20,000 x-rays, MRIs, and CT examinations of children each year, of which approximately four or five a month involve child-abuse cases. Dr. Sivit testified that Jordan's rib injuries were of different dates, due to the callus growth on some of the fractures and the lack of it on others. He testified that the pattern of rib injuries indicated abuse. He further noted a small fracture spotted on Jordan's right femur, referred to as a distal metaphyseal injury. According to Dr. Sivit's testimony, such a fracture is highly specific for abuse in that "of all the fractures [seen] in children with varying mechanisms, almost exclusively this fracture is seen only in abused children." He found no evidence of rickets or other bone disease; rather, Dr. Sivit testified that Jordan's bones appeared normal as opposed to the "widened, irregular, and frayed long bones" consistent with rickets. He opined to a reasonable degree of medical certainty that Jordan's injuries were not caused by an underlying metabolic bone disease. He further opined to a reasonable degree of medical certainty that the injuries were caused by intentional trauma consistent with a squeezing motion.

{¶ 13} The final physician testifying for the state was Dr. Levine, who had examined Jordan on his parents' motion. Dr. Levine is the Director of the Laboratory of Molecular and Cellular Endocrinology at the Cleveland Clinic and an expert in metabolic bone diseases. Based upon his extensive evaluation of Jordan, the family history, and examination results, Dr. Levine concluded that Jordan "has none of the features on physical examination that * * * would point toward a diagnosis of either a metabolic bone disease or a bone fragility syndrome such as osteogenesis imperfecta. He has a completely normal biochemical profile related to mineral metabolism and his x-rays show no evidence of a metabolic bone disease or a skeletal dysplasia." Dr. Levine also concluded, with a reasonable degree of medical certainty, that Jordan does not have any metabolic bone disease, but rather, Jordan has a "normal skeleton and a normal mineral metabolism."

{¶ 14} Dr. Levine additionally concluded that there was no evidence of rickets in Jordan. He explained that rickets is a bone disease that causes an abnormality in bone mineralization, meaning that soft tissue is converted into hard tissue because of an inadequate supply of either calcium or phosphorus. Also, the long

bones become weakened and tender because of a growth plate defect with rickets. However, according to Dr. Levine, Jordan "had none of the clinical features of rickets in a symptomatic phase. His x-rays were not consistent with rickets in June when he first presented for evaluation. Further, Jordan's biochemical tests, conducted in both June and September, were not consistent with rickets." In Dr. Levine's medical opinion, Jordan's injuries were not caused by bone fragility or rickets.

{¶ 15} However, Dr. Levine commented that "children who have fragile bones do not develop fractures spontaneously and that all fractures reflect some degree of application of force. And children who have very fragile bones will develop a fracture through application of less force than a child who has bones of normal strength." Thus, even if Jordan had a disease process that caused fragile bones, force would nevertheless be required to cause the fractures at issue.

{¶ 16} In light of the foregoing, Dr. Levine testified:

{¶ 17} "The lack of a history of an injury occurring, the apparent delay in bringing in the child for medical attention relative to the injuries documented by the x-rays in June, the pattern of fractures that were documented on the x-rays in June, and then the absence of any additional fractures once the child was removed from his home following the evaluation in June all [led him] to conclude that this was not a bone fragility syndrome but non-accidental trauma."

{¶ 18} Dr. Patrick D. Barnes testified for Jordan's parents. He is a pediatric neuroradiologist at Lucile Packard Children's Hospital at Stanford University Medical Center in California. He co-authored one chapter on head injuries and child abuse and another chapter on imaging technologies for child abuse in *Diagnostic Imaging of Child Abuse*, with Dr. Paul Kleinman. Dr. Barnes testified that Jordan's head injury was old and could have been caused by the use of vacuum devices at his delivery. He testified that the lack of recent hemorrhaging and the rounded and/or irregular edges of Jordan's skull fracture, as shown in the various images made of it in June 2007, indicated that the injury was old and should have alerted the doctors examining him in June 2007 to look into his medical history—which they did not. He testified that it was normal for such injuries to take several months to manifest themselves. He testified that there was evidence in the images of Jordan's skull of a bone disorder or nutritional problem, such as rickets. He testified that proper procedure when an infant like Jordan presents with such an injury is to check the child's medical history to rule out birth trauma. He warned that symptoms of various bone disorders mimic those of child abuse. Ultimately, he testified that he could not rule child abuse in or out as a cause of Jordan's injuries, because he believed the child also displayed symptoms of rickets or other bone disorders.

{¶ 19} Dr. Kathy Keller, a board-certified pediatric radiologist teaching at Stanford, also testified for Jordan's parents. Dr. Keller had considerable experience in pediatric imaging for child abuse. Dr. Keller opined that Jordan had suffered from rickets. She based this on the images of Jordan's skull, including the sutures and what she identified as "floating teeth"; a ricketic rosary on his anterior ribs; evidence of metaphyseal lesions on both knees; and that his rib fractures were not healing normally. She noted that it is difficult to date a fracture in children with rickets, due to abnormal healing. She strongly disagreed with Dr. Levine's conclusion that lack of a vitamin D deficiency in September 2007 indicated that Jordan did not have such a deficiency in June 2007. She noted that the rib injuries were consistent with labor trauma, such as Jordan experienced, in a child with rickets. Indeed, she believed that all his injuries were consistent with rickets and could result from birth trauma or normal handling of a child so afflicted. Her ultimate opinion was that Jordan suffered from the disease in June 2007. She admitted that she could not rule out child abuse as the source of his injuries.

{¶ 20} October 30, 2007, the trial court filed its judgment entry finding Jordan to be abused, pursuant to R.C. 2151.031(C). It further adjudicated Jillian and Jayden to be dependent pursuant to R.C. 2151.04(C), i.e., children whose guardianship by the state is justified by their condition or environment.[2]

{¶ 21} On November 26, 2007, Teresa timely filed three notices of appeal. Andrew followed suit on November 29, 2007. This court consolidated the matters for briefing and oral hearing. On appeal, each party asserts three assignments of error. Since Teresa's and Andrew's assignments of error track each other, we consider their assignments of error together.

{¶ 22} Teresa's first assignment of error alleges:

{¶ 23} "The juvenile court's adjudication of Jordan Savchuk as an abused child was against the manifest weight of the evidence."

{¶ 24} Similarly, Andrew's first assignment of error contends:

{¶ 25} "The trial court erred when it found Jordan Savchuk an 'abused child' pursuant to O.R.C. § 2151.031(C)."

{¶ 26} By their first assignments of error, Jordan's parents assert that the trial court's conclusion that Jordan was an abused child is against the manifest weight of the evidence.

---

2. We note, however, that Jillian and Jayden were returned to their parents' custody, under protective supervision of LCDJFS, on the day after the trial court filed its judgment—October 31, 2007. Further, Jordan himself was returned to their custody under protective supervision on December 28, 2007.

{¶ 27} In this case, the trial court determined both that Jordan's injuries were nonaccidental and that they varied from the history given.

{¶ 28} In juvenile proceedings, we apply the criminal standard for reviewing manifest-weight challenges. Cf. *In re Corey,* 11th Dist. No. 2005–G–2649, 2006-Ohio-2013, 2006 WL 1062871, at ¶ 17. Under this standard, when reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered. *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717; see also *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 29} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175, 20 OBR 215, 485 N.E.2d 717. The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. *Thompkins* at 390, 678 N.E.2d 541 (Cook, J., concurring). The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, at paragraph one of the syllabus. Indeed, "[o]nce the clear and convincing standard has been met to the satisfaction of the [juvenile] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof." *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 18 OBR 419, 481 N.E.2d 613.

{¶ 30} When assessing witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan* (1986), 22 Ohio St.3d 120, 123, 22 OBR 199, 489 N.E.2d 277. "Indeed, the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." *Warren v. Simpson* (Mar. 17, 2000), 11th Dist. No. 98–T–0183, 2000 WL 286594, *3. If the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. Id.

{¶ 31} Furthermore, this court has held:

{¶ 32} " 'In an adjudicatory hearing regarding a claim of dependency, neglect and/or abuse, the requisite burden of proof is by clear and convincing evidence'

[*In re*] *Anthony* [11th Dist. No. 2002–A–0096], 2003-Ohio-5712 [2003 WL 22429035], at ¶ 16, citing Juv.R. 29(E)(4).

{¶ 33} " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," * * * and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, at paragraph three of the syllabus. The state, as the party seeking the adjudication, 'has the burden of establishing * * * that a child is abused or neglected before the court may enter a finding of abuse or dependency.' *In re Stewart* (Mar. 20, 2000), 12th Dist. No. CA99–08–024, * * *, 2000 WL 290134, [at *3]. 'Requiring the state to prove its case by clear and convincing evidence is part of the protection afforded to parents in abuse and dependency cases.' [Stewart at *4]." *In re Veccia*, 11th Dist. No. 2005–T–0141, 2006-Ohio-6095, 2006 WL 3350706, at ¶ 30–31.

{¶ 34} Jordan was adjudicated abused pursuant to R.C. 2151.031(C), which provides:

{¶ 35} "As used in this chapter, an 'abused child' includes any child who:

{¶ 36} " * * *

{¶ 37} " * * *

{¶ 38} "(C) Exhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it. * * * "

{¶ 39} Accordingly, in a case charging abuse pursuant to R.C. 2151.031(C), the state must show, by clear and convincing evidence, two elements: (1) that the child sustained physical or mental injury and (2) the injury was inflicted by nonaccidental means, or was at variance with the history given.

{¶ 40} In this case, there is no question that Jordan sustained physical injuries. The controversy concerns whether the state introduced clear and convincing evidence that these injuries were nonaccidental or were at variance with the history given. For the reasons discussed below, we hold that the state met its burden.

{¶ 41} The evidence demonstrated that Teresa and Andrew were the sole caregivers for Jordan since his birth. Teresa described Andrew as a "rough guy" and, during his interview, Andrew appeared fidgety and overly emotional. When the couple was asked about episodes of domestic violence, both parents acknowledged a recent incident in which Teresa slapped Andrew. Moreover, Teresa described the couple's relationship as being rocky since Jordan was born and stated that they had had difficulty adjusting to the new baby.

{¶ 42} Further, the parents related to Detective Doyle and Assistant Chief DelCalzo that their arguments occasionally led to physical contact between them. Teresa told the officers that she had a recent discussion with Andrew about being too rough with Jordan. Teresa also told the officers that Andrew had some anger issues, i.e., he had been known to strike objects, such as walls, when angry. Moreover, during the officers' interview, Andrew was notably emotional and had difficulty recalling the events of the weekend when Jordan was injured. In fact, Assistant Chief DelCalzo pointed out that whenever the officers sought specific information, Andrew invariably broke down and was unable to provide answers to questions. However, according to DelCalzo, Andrew's emotional upheavals were unaccompanied by tears. The officers found Andrew's behavior suspect.

{¶ 43} Dr. McDavid, a professor of pediatric medicine, testified that Jordan's rib and chest injuries were a result of excessive squeezing. She also testified that her examinations revealed that the injuries had occurred at different times, but there was no documented history of the injuries. She testified that there was no evidence that Jordan had osteogenesis imperfecta and, after reviewing films with radiologists, determined that there was no concern for rickets. Given the severity of the multiple injuries and the lack of explanation, Dr. McDavid concluded that the injuries are consistent with child abuse.

{¶ 44} Dr. Sivit, a pediatric radiologist, reviewed several x-rays of Jordan's rib and chest areas and testified that the fractures in these regions had occurred at different times, given the presence or absence of callus formations. He asserted that the posterior and anterolateral rib fractures are relatively uncommon in children and thus highly specific for abuse and/or rarely occur in the absence of abuse. The doctor further pointed out that Jordan's femur fracture involved a distal metaphyseal injury, another injury highly specific for abuse. Dr. Sivit opined that skull fractures can be seen with any type of trauma. However, the fact that it was present with other injuries raised additional concerns that Jordan was abused.

{¶ 45} Dr. Sivit found no evidence of osteogenesis imperfecta or any other bone deformities. Dr. Sivit further testified that he saw no evidence of rickets in Jordan because, other than the fractures, his bones looked normal. The doctor searched for radiographic signs of disease processes. Dr. Sivit testified, with a reasonable degree of medical certainty, that the injuries were not a function of irregularities from an underlying metabolic process. He indicated that he always looks for such problems, irrespective of the history of the patient. If he observes abnormalities, he then attempts to establish a differential diagnosis; however, because he saw no abnormalities, save the fractures, he concluded, with a high degree of certainty, the injuries were indicative of intentional trauma.

{¶ 46} Finally, Dr. Levine, a specialist in metabolic bone diseases, testified that children who have fragile bones do not develop fractures spontaneously. In other words, all fractures reflect the use of some degree of force. After reviewing a battery of tests, Dr. Levine concluded that Jordan did not have a metabolic bone disease or any other bone-fragility syndrome such as osteogenesis imperfecta. Further, the doctor determined that Jordan did not exhibit any clinical features of rickets. In his medical opinion, Dr. Levine maintained that Jordan's bones had normal density and his injuries were not a result of bone fragility. Dr. Levine therefore concluded, with a reasonable degree of medical certainty, that Jordan has a normal skeleton and normal mineral metabolism.

{¶ 47} Moreover, Dr. Levine distinguished accidental and nonaccidental trauma. He testified that the history of the trauma is the key to drawing the distinction. When an injury is accidental, there is generally a very clear preceding event that is the cause of the injury. By contrast, nonaccidental trauma typically occurs in the absence of a history of injury. In light of this foundation, Dr. Levine testified that Jordan was a victim of nonaccidental trauma because his injuries had no history. Further, given the evidence that there was an apparent delay in seeking medical attention and Jordan suffered no more trauma once he was removed, led Dr. Levine to conclude that the injuries were intentionally inflicted on the baby.

{¶ 48} Although Andrew and Teresa put forth evidence from Doctors Barnes and Keller indicating that Jordan's injuries were the result of either metabolic bone disease or birth trauma, the court evidently concluded that the state's experts were more credible and persuasive. As indicated above, this court must defer to the trier of fact's factual findings regarding the credibility of witnesses, and we may not substitute our judgment on such matters for the trier of fact. Under the circumstances, there was clear and convincing evidence presented in the form of expert testimony that Jordan sustained multiple physical injuries of which no history was offered and these injuries were inflicted in a nonaccidental fashion. Given the evidence and testimony submitted by the state, we cannot conclude that the trial court clearly lost its way, thereby creating a manifest miscarriage of justice.

{¶ 49} Teresa's and Andrew's first assignments of error are thus overruled.

{¶ 50} Teresa's second assignment of error asserts:

{¶ 51} "The juvenile court's adjudication of Jillian and Jayden Savchuk as dependent children was against the manifest weight of the evidence."

{¶ 52} Andrew's second assignment of error contends:

{¶ 53} "The trial court erred when it found Jayden and Jillian Savchuk are 'dependent children' pursuant to O.R.C. § 2151.04(C)."

{¶ 54} Each of the foregoing assigned errors operates to attack the weight of the evidence on which the trial court based its conclusion.

{¶ 55} R.C. 2151.04(C) provides that a dependent child is one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship."

{¶ 56} In the case sub judice, the state sought a finding of dependency for Jillian and Jayden because of the injuries sustained by their younger brother Jordan. The state's complaint asserted:

{¶ 57} "The Lake County Department of Job and Family Services is concerned for the welfare and safety of the children due to the unexplained injuries that Jordan has sustained. The Department feels that Jillian and Jayden's safety cannot be ensured because it is unknown what happened to Jordan."

{¶ 58} As neither parent could explain Jordan's injuries, LCDJFS was unable to ensure the children's safety in the parent's custody and care. Ultimately, Jordan was found to be an abused child, and his parents were unable to provide an adequate explanation for his serious injuries. The finding of abuse, while not an indication of fault on behalf of the parents, was sufficient to support the juvenile court's finding that Jillian's and Jayden's condition or environment warranted guardianship.

{¶ 59} Appellants challenge the court's finding by pointing out that neither Jillian nor Jayden suffered any injuries. Although Jillian and Jayden were not found to be harmed or injured, a finding of dependency does not require a child to suffer from abuse. The state was only required to demonstrate that the children's condition or environment was such that their best interests warranted its involvement. Jordan was determined to be an abused child due to multiple, fairly severe injuries for which the parents could not definitively account. Under these circumstances, we hold that there was clear and convincing evidence to warrant the state's involvement.

{¶ 60} Teresa's and Andrew's second assignments of error are overruled.

{¶ 61} Teresa's third assignment of error claims:

{¶ 62} "The juvenile court abused its discretion by overruling Teresa Palkovic's motion to exclude the testimony and written report of Dr. Michael Levine from coming into evidence."

{¶ 63} Likewise, Andrew's third assignment of error asserts:

{¶ 64} "The trial court erred by denying Mother's Motion to exclude witness Dr. Levine."

{¶ 65} Under these assigned errors, appellants contend that the juvenile court erred when it permitted the testimony and report of Dr. Levine. With respect to the report, the court concluded that "admission of the medical report after a person has testified is not proper and will be excluded." Because the report was excluded, we need not address this component of their argument.

{¶ 66} With respect to the doctor's testimony, the state failed to include Dr. Levine on its initial witness list. On September 28, 2007, the state provided appellants with a witness and exhibit list. However, Dr. Levine's report was not provided to the state until October 16, 2007, after the adjudication hearing had already commenced. Once the state learned of the contents of the doctor's report, a supplemental witness and exhibit list was filed.

{¶ 67} Juv.R. 24(A) provides:

{¶ 68} "Upon written request, each party of whom discovery is requested shall, to the extent not privileged, produce promptly for inspection, copying, or photographing the following information, documents, and material in that party's custody, control, or possession:

{¶ 69} "(1) The names and last known addresses of each witness to the occurrence that forms the basis of the charge or defense * * *."

{¶ 70} The decision to have Dr. Levine testify occurred subsequent to the state's disclosure of witnesses. As such, the attempt to use his testimony was a technical discovery violation. However, a court may permit an undisclosed witness of the state to testify, notwithstanding a discovery violation, "'if the state's failure to provide discovery was not willful, foreknowledge of the testimony would not have benefitted the defendant in preparation of his defense, and the defendant was not prejudiced by admission of the evidence.'" *State v. Ballentine* (Nov. 29, 1996), 11th Dist. No. 95–L–076, 1996 WL 811866, *3, quoting *State v. Heinish* (1990), 50 Ohio St.3d 231, 236, 553 N.E.2d 1026.

{¶ 71} Here, the record indicates the state's failure to list Dr. Levine was not a function of gamesmanship or ambush tactics. It did not receive the doctor's report until the hearing had commenced. We thus do not believe that the state acted willfully in failing to include Dr. Levine in the original list. Further, foreknowledge of Dr. Levine's testimony would not have clearly benefitted appellants' preparation. His testimony was similar to that of doctors McDavid and Sivit, and appellants had already enlisted their own experts to rebut the content of this testimony. Moreover, Teresa was aware of the nature of Dr. Levine's examination prior to trial, i.e., she filed a motion requesting that LCDJFS have Jordan clinically evaluated by Dr. Levine. Accordingly, we can surmise that Teresa was actually aware of the fundamental tenor and content of Dr. Levine's testimony. Finally, appellants were not prejudiced by the admission

of Dr. Levine's testimony. Teresa had some awareness of the nature of Dr. Levine's assessment and the substance of his conclusion. By virtue of Teresa's awareness and the similarity between Dr. Levine's testimony and the state's additional expert's testimony, appellants were therefore adequately prepared to cross examine the doctor.

{¶ 72} Because the evidence indicates that each of the factors discussed in *Ballentine* et al. were met, we find no abuse of discretion in the trial court's decision to allow Dr. Levine to testify.

{¶ 73} Appellants' third assignments of error are overruled.

{¶ 74} For the reasons discussed in this opinion, appellants' six total assignments of error are without merit. Therefore, the judgment of the Lake County Court of Common Pleas is affirmed.

Judgment affirmed.

CANNON, J., concurs.

O'TOOLE, J., dissents.

COLLEEN MARY O'TOOLE, Judge, dissenting.

{¶ 75} Because I do not believe that the state carried its burden of showing either that Jordan was an abused child, pursuant to R.C. 2151.031(C), or that Jayden and Jillian were dependent children, pursuant to R.C. 2151.04(C), I would reverse and remand based on their parents' first and second assignments of error. In consequence of that, I would find the third assignment of error moot.

{¶ 76} Under the statutes, findings of either abuse or dependency require the state to prove its case by clear and convincing evidence—evidence that "will produce in the mind of the trier of facts a *firm* belief or conviction as to the facts sought to be established." (Emphasis added.) *Cross*, 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, at paragraph three of the syllabus. As the majority notes, this high evidentiary standard is meant to protect parents' constitutional right to raise and nurture their offspring. Cf. *Veccia*, 2006-Ohio-6095, 2006 WL 3350706, at ¶ 31. The evidence presented by the state in this case is simply of insufficient quality to meet the standard required.

{¶ 77} Five medical experts testified. The three distinguished physicians from Rainbow stated that Jordan's injuries correlated highly with child abuse. However, they admitted to not having checked into his medical history, and they were unaware of, or failed to take into account, his traumatic birth. Dr. Barnes testified that when a newborn presents with a skull fracture like Jordan's, determining whether the injury might have resulted from birth trauma is a requisite. In effect, there was a failure in the standard of care. And while we

are required to defer to the trial court's determination of the credibility of witnesses, that court stated that all the physicians testifying before it were credible. It is further worth noting that Dr. Sivit admitted in his own testimony that Dr. Paul Kleinman, with whom Dr. Barnes coauthored two chapters in *Diagnostic Imaging of Child Abuse,* is the leading authority in the field of radiology and child abuse.

{¶ 78} Further, both Dr. Barnes and Dr. Keller strongly opposed the testimony of all three of the state's medical witnesses that Jordan did not display symptoms of rickets or a metabolic bone disorder. Both asserted that babies with rickets often display injuries mimicking those typical of child abuse. Dr. Keller testified that all of Jordan's injuries might be the result of birth trauma and normal handling, if he did have rickets. The trial court specifically accepted her testimony was credible, and that Jordan did have rickets.

{¶ 79} Of course, both Dr. Barnes and Dr. Keller admitted that they could not rule out child abuse as the source of Jordan's injuries. But this was because no attempt was made by the attending physicians in June 2007 to rule out rickets as the source.

{¶ 80} I simply cannot see that the state presented *clear and convincing* evidence that Jordan was abused. I would not find that it presented a preponderance of evidence that he was abused.

{¶ 81} Again, the state failed to present clear and convincing evidence that the environment of Jillian and Jayden rendered them dependent. X-rays taken at Rainbow at the time of their brother's examination in June 2007 failed to establish any injuries, and neither did their medical records. The police established that inspection of the Palkovic/Savchuk home revealed nothing to arouse suspicion. Indeed, Teresa and Andrew had taken measures to make the house safe for toddlers.

{¶ 82} Fundamentally, the findings of dependency appear to be based on suspicions regarding the demeanor and conduct of Andrew. He was alone with Jordan for several hours the day before Teresa noticed the skull fracture. Teresa admitted that Andrew is a rough man, who likes to roughhouse with his children. He has occasionally physically displayed anger towards her. He was distraught and uncommunicative the evening Jordan was brought to Rainbow.

{¶ 83} I do not think that these facts rise, as a matter of law, to clear and convincing evidence that Andrew's conduct renders his household an unfit environment for his daughters.

{¶ 84} I further note that Jayden and Jillian were reunited with their parents at the dispositional hearing held October 31, 2007—*one* day following the entry of the judgment appealed. Jordan returned to his parents' household by the end of

December 2007. There seems to have been no criminal investigation of Andrew. These facts strongly suggest that the authorities involved realized that these children were neither dependent nor abused.

{¶ 85} Under the majority's analysis, it is difficult to visualize any scenario under which an aggrieved parent could ever mount a manifest-weight challenge to a finding of dependency or neglect.

{¶ 86} I respectfully dissent.