Opinion by JUDGE TAUBMAN
¶ 1 Defendant, Mark Alton Friend, appeals the trial court's judgment of conviction entered on jury verdicts finding him guilty of (1) first degree murder-victim under the age of twelve, position of trust; (2) child abuse causing death; (3) child abuse causing death-pattern of conduct; (4) two counts of child abuse causing serious bodily injury; and (5) child abuse causing serious bodily injury-pattern of conduct. We affirm in part, vacate in part, and remand for correction of the mittimus.
I. Background
¶ 2 At approximately 2:00 a.m. on January 15, 2008, the police were dispatched to Friend's apartment because M.B., the daughter of Friend's girlfriend, C.H., was no longer breathing. The police administered CPR on M.B. to no avail and a paramedic ultimately transported her to the hospital. The police subsequently notified M.B.'s biological father, A.B., that his daughter had been admitted to the hospital. The next day, a doctor informed A.B. that his daughter was legally brain dead. A.B. decided to remove her from life support, and she later died.
¶ 3 As part of their investigation, an officer and Detective Thrumston, who later testified at trial, interviewed Friend. Although Friend did not disclose much during the interviews at his apartment, he later revealed in a separate videotaped interview with Detective Thrumston that he had hit M.B. on several occasions. He told her that he had popped M.B. in the back of the head so hard that she hit the bed face forward and sprung back and also hit her head on the carpet which covered a cement floor. He stated that he then picked M.B. up, threw her on the bed, took her clothes off, and told her she had to take a bath. He also said that when she began to vomit and later became unresponsive, he threw water on her to revive her.
*620 ¶ 4 Further, he stated that a few days before M.B.'s death, he had shoved M.B. into a door, and she hit the back of her head so hard that her feet left the ground. She then vomited her dinner and eventually fell to the floor and became unresponsive. Friend then placed her in the bathtub and splashed water on her face to help her regain consciousness.
¶ 5 In addition, Friend told Detective Thrumston that he had held M.B.'s head underwater in the bathtub until bubbles came out and that he had flicked M.B. in the vagina with his finger.
¶ 6 Based on these statements, the People charged Friend with the offenses noted above, and the jury convicted him of all charges. The court then sentenced Friend to life in prison without the possibility of parole for his murder conviction and ordered concurrent sentences on the remaining convictions. Friend now appeals.
II. Batson Challenge
¶ 7 Friend contends that the trial court erred in concluding that he had to be of the same race or cognizable group as that of an excused juror to make a challenge under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). He also argues that the prosecution did not provide race-neutral grounds for excusing Juror H, and that the court did not address the third prong of the Batson analysis to determine whether Friend successfully rebutted the race-neutral grounds. We agree with Friend that he need not be of the same race or cognizable group to make a Batson challenge, but disagree with his remaining contentions.
A. Standard of Review
¶ 8 A Batson analysis involves a three-step process, noted below, and the standard of review we apply depends on the specific step of the analysis at issue. Valdez v. People, 966 P.2d 587, 590-91 (Colo.1998). We review a trial court's ruling on steps one and two of a Batson challenge de novo and the court's decision on step three for clear error. Id. at 590. Unlike the first two steps, the third step presents a question of fact as to which the trial court is in the best position to determine the demeanor of the attorney who exercises the challenge. People v. O'Shaughnessy, 275 P.3d 687, 691 (Colo.App.2010), aff'd, 2012 CO 9, 269 P.3d 1233. As a result, we generally defer to the trial court's finding on the third step of the Batson analysis. Id .
B. Analysis
¶ 9 Batson, 476 U.S. at 89, 106 S.Ct. 1712 and Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), established that under the Equal Protection Clause of the Fourteenth Amendment, a prosecutor may not exclude potential jurors solely because of their race. Valdez, 966 P.2d at 589 ; O'Shaughnessy, 275 P.3d at 690. Batson outlines three steps for evaluating claims of racial discrimination in jury selection: (1) the defendant must establish a prima facie case of discrimination; (2) if the defendant does so, the prosecution must give a race-neutral reason for its peremptory strike; and (3) the court must determine whether the defendant has proven discrimination by a preponderance of the evidence. Valdez, 966 P.2d at 589 ; O'Shaughnessy, 275 P.3d at 690.
¶ 10 To raise a Batson challenge, the defendant and the excused prospective juror need not be of the same cognizable racial group. Powers v. Ohio, 499 U.S. 400, 415, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).
¶ 11 Here, Friend made a Batson challenge when the prosecutor used a peremptory challenge to excuse Juror H, an African-American. The prosecutor asserted that Friend could not make a Batson challenge because he was not African-American. The trial court agreed and concluded that the challenged juror and the defendant had to be of the same race.
¶ 12 We conclude that the trial court improperly held that Friend lacked standing to make a Batson challenge. See id.
¶ 13 In the alternative, the court engaged in a Batson analysis, which we now review. Because the parties do not dispute that Friend satisfied step one of the Batson analysis, we review only steps two and three.
*621 ¶ 14 At step two, the prosecutor's explanation must be "based on something other than the race of the juror," and will be deemed race neutral so long as the prosecutor's explanation lacks an inherently discriminatory intent. Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion); People v. Robinson, 187 P.3d 1166, 1172 (Colo.App.2008).
¶ 15 If the prosecutor offers a race-neutral explanation for excusing a prospective juror, the trial court must then proceed to step three of the Batson analysis. Robinson, 187 P.3d at 1173. At step three, the court must determine whether the defendant has established purposeful discrimination. Id . Purposeful discrimination means that the prosecutor strikes a prospective juror "because of" the juror's race. People v. Collins, 187 P.3d 1178, 1181 (Colo.App.2008). While engaging in a Batson analysis, the court must consider all relevant evidence, both direct and circumstantial. Id .
¶ 16 Further, while the trial court should provide defense counsel with an opportunity to rebut the prosecutor's stated reasons before ruling on a Batson challenge, we do not reverse a trial court's ruling unless such a denial prejudices the defendant. See Robinson, 187 P.3d at 1174 (affirming the trial court's denial of defendant's Batson challenge even though the court did not ask defense counsel if he wanted to offer a rebuttal, because there was no indication in the record that defense counsel requested an opportunity to rebut the prosecutor's stated reasons for striking a prospective juror).
¶ 17 Here, the prosecutor moved to excuse Juror H because she was not paying much attention during voir dire; she did not remember a fellow prospective juror even though that juror had recognized her; she had had a bad experience with law enforcement; and she had responded to defense counsel's questions without showing any emotion. The court found that those reasons were race neutral and denied Friend's Batson challenge without giving his counsel the opportunity to rebut the prosecutor's assertions. The record does not indicate that Friend's counsel asked the court for an opportunity to rebut the prosecutor's explanations.
¶ 18 Therefore, we conclude that the trial court's ruling was proper. With respect to step two, the prosecutor provided several race-neutral reasons for excusing Juror H. As to step three, while the court should have provided Friend's counsel with an opportunity to rebut the prosecutor's stated reasons, as in Robinson, Friend was not prejudiced, given the lack of any objection.
¶ 19 Contrary to Friend's contention, the court also reached the third step of the Batson analysis. Based on the prosecutor's reasons, the court found that the peremptory challenge was not pretextual. Instead, the court stated that the prosecution's reasons "all make sense and are legitimate. I can't find any racial bias in those answers that the People have given." Because step three involves a question of fact, absent a showing of clear error, we defer to the trial court's finding and conclude that the court's denial of Friend's Batson challenge was proper.
III. Denial of Challenges for Cause
¶ 20 Friend next contends that the trial court should have granted his challenges for cause to two prospective jurors, Juror C and Juror W, who were later removed by peremptory challenges. According to Friend, these two jurors had expressed hesitance about their abilities to decide the case based on the evidence presented, and, as a result, the court erred in not rehabilitating them. We disagree.
A. Standard of Review
¶ 21 We review a trial court's denial of a challenge for cause for an abuse of discretion, while examining the entire voir dire of the prospective juror. See § 16-10-103, C.R.S.2013; Carrillo v. People, 974 P.2d 478, 486 (Colo.1999) ; People v. Hancock, 220 P.3d 1015, 1016 (Colo.App.2009). Because the trial court is in the best position to determine a prospective juror's credibility, demeanor, and sincerity in explaining his or her state of mind, we defer to its ruling on a challenge for cause. Hancock, 220 P.3d at 1016.
*622 ¶ 22 Even if the trial court abuses its discretion, however, reversal is required only when a defendant demonstrates that a biased juror actually sat on the jury. See People v. Marciano, 2014 COA 92, ¶ 10, 411 P.3d 831. When an allegedly biased juror is not impaneled, the defendant cannot establish prejudice. See People v. Novotny, 2014 CO 18, ¶¶ 2, 27, 320 P.3d 1194 (abandoning the automatic reversal rule set forth in People v. Macrander, 828 P.2d 234, 243 (Colo.1992) ); People v. Richardson, 2014 COA 50, ¶ 38, 350 P.3d 905 ; see also People v. Wise, 2014 COA 83, ¶ 28, 348 P.3d 482.
B. Analysis
¶ 23 Due process requires a fair trial, which necessarily includes the right to challenge a juror for cause. People v. Wilson, 114 P.3d 19, 21 (Colo.App.2004). To protect a defendant's right to a fair trial with an impartial jury, a trial court must excuse biased persons from the jury. Id . ; see § 16-10-103(1)(j) (stating the court must sustain challenges for cause where "[t]he existence of a state of mind in the juror evinc[es] enmity or bias toward the defendant or the state"); see also Crim. P. 24(b)(1)(X).
¶ 24 Here, even if the trial court abused its discretion in denying Friend's challenges for cause, the two prospective jurors, Juror C and Juror W, did not sit on the jury. Further, Friend has not alleged that any of the actual jurors was biased. Thus, Friend cannot establish prejudice under Novotny . See Wise, ¶ 27. Accordingly, any error committed by the trial court was harmless. Id. at ¶ 29.
IV. Admission of Expert Witness Testimony
¶ 25 Friend also contends that the trial court erred in admitting the testimony of three expert witnesses-Dr. Paul Grabb, Dr. Brian E. Grabert, and Dr. David Lee-concerning whether M.B. had suffered accidental or nonaccidental trauma. Friend argues that the experts' opinions were unreliable because they did not provide a medical or scientific basis for this aspect of their testimony. Additionally, Friend maintains that the trial court abused its discretion in concluding that the probative value of the experts' testimony outweighed the danger of unfair prejudice. We disagree.
A. Standard of Review
¶ 26 We review a trial court's admission of expert testimony for an abuse of discretion and reverse only when that decision is manifestly erroneous. People v. Rector, 248 P.3d 1196, 1200 (Colo.2011). "This deference reflects the superior opportunity of the trial judge to assess the competence of the expert and to assess whether the expert's opinion will be helpful to the jury." Id .
B. Analysis
¶ 27 CRE 702 governs the admissibility of expert testimony. It states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, [then] a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
¶ 28 Scientific evidence is admissible under CRE 702 if it is both reliable and relevant. People v. Shreck, 22 P.3d 68, 77 (Colo.2001). To determine the admissibility of expert testimony, a trial court must conduct a Shreck analysis, which requires showings that (1) the scientific principles underlying the testimony are reasonably reliable; (2) the expert is qualified to opine on such matters; (3) the expert testimony will be helpful to the jury; and (4) the evidence satisfies CRE 403 such that the probative value of the evidence is not substantially outweighed by its prejudicial effect. Id. at 77-79.
¶ 29 Here, Friend contends that the court should have excluded the doctors' testimony because it was not based on a scientific or medical test that could determine whether M.B.'s injuries resulted from accidental or nonaccidental trauma. While the doctors did not use any medical test to conclude that M.B.'s injuries were consistent with nonaccidental trauma, all three applied methodologies are commonly used by doctors, including (1) examining the patient's physical condition and injuries; (2) using a process of eliminating *623 various illnesses and diseases to diagnose a patient; and (3) reviewing the patient's history to determine a possible cause for the patient's injuries.
¶ 30 Dr. Lee, a pediatric ophthalmologist, testified that he completed a comprehensive eye exam, and, as part of his examination, obtained M.B.'s medical history. Although Dr. Lee could not explain why M.B.'s multi-layered retinal hemorrhages were, in his opinion, likely the result of nonaccidental trauma, he said that the medical field and literature generally accepted and supported his conclusion. Thus, based on his examination and M.B.'s history, he concluded that the death was nonaccidental. Similarly, Dr. Grabert, a child neurologist, conducted a comprehensive eye and brain stem exam, and relied on M.B.'s medical history to conclude that her death was nonaccidental. In contrast, Dr. Grabb, a pediatric neurosurgeon, observed the results of medical exams, such as CT scans, and used a process of elimination to conclude that M.B.'s injuries were the result of nonaccidental trauma.
¶ 31 We conclude that a process of elimination and the use of a patient's medical history to rule out alternative explanations are reliable scientific methods. See Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1236 (10th Cir.2004) (process of elimination); Estate of Ford v. Eicher, 220 P.3d 939, 944 (Colo.App.2008) (process of elimination), aff'd, 250 P.3d 262 (Colo.2011) ; Farmland Mut. Ins. Cos. v. Chief Indus., Inc., 170 P.3d 832, 836 (Colo.App.2007) (process of elimination); In re Juan M., 360 Ill.Dec. 431, 968 N.E.2d 1184, 1192 (Ill.App.Ct.2012) (history); In re Savchuk Children, 180 Ohio App.3d 349, 905 N.E.2d 666, 674-75 (2008) (history). By eliminating the presence of any illness or disease, and finding an absence of any accidental trauma to explain M.B.'s injuries, each expert testified that the injuries were consistent with nonaccidental trauma. Thus, the experts' scientific methods satisfied the reliability requirement of Shreck .
¶ 32 Further, Friend contends that the probative value of the expert witnesses' testimony was substantially outweighed by the danger of unfair prejudice. Specifically, Friend argues that the opinions lacked a medical foundation and, therefore, were more confusing and misleading than helpful.
¶ 33 The trial court, however, concluded that the testimony satisfied CRE 403. First, it found the testimony was highly probative because it helped the jury determine whether M.B.'s death was caused by accidental or nonaccidental trauma. Moreover, the court found that the testimony was not unfairly prejudicial because it would not "move the jury to any sort of irrational behavior, that they would use [the doctors'] testimony to bring in a verdict based on improper motive or anything of the like."
¶ 34 Based on the court's findings, we conclude that the trial court did not abuse its discretion in admitting the doctors' testimony.
V. Admissibility of Detective Thrumston's Testimony
¶ 35 Friend further argues that the trial court erred in admitting Detective Thrumston's testimony recounting the removal of life support from M.B. because her testimony was irrelevant and highly prejudicial. In addition, he argues that the trial court should have granted his motion for a mistrial because Detective Thrumston expressed emotion during her testimony. We disagree.
A. Standard of Review
¶ 36 We review a trial court's rulings on the admissibility of evidence and denial of a mistrial for abuse of discretion. See People v. Greenlee, 200 P.3d 363, 366 (Colo.2009) ; see also People v. Lehmkuhl, 117 P.3d 98, 104 (Colo.App.2004). A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair. Greenlee, 200 P.3d at 366.
B. Analysis
¶ 37 As a threshold matter, only relevant evidence is admissible. CRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it *624 would be without the evidence." CRE 401. However, not all relevant evidence is admissible. See CRE 403. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Id . Evidence is unfairly prejudicial if it introduces extraneous considerations into the trial, such as bias, sympathy, anger, or shock, that cause the jury to decide the case on an improper basis. See Masters v. People, 58 P.3d 979, 1001 (Colo.2002) ; People v. Dist. Court, 869 P.2d 1281, 1287 (Colo.1994).
¶ 38 Here, Detective Thrumston testified that she was present when Bogard decided to remove M.B. from life support. However, defense counsel objected when the prosecutor asked the detective what she discussed with Bogard. The court sustained that objection.
¶ 39 Defense counsel subsequently made a prophylactic objection to preclude the detective from expressing emotions that might inflame the prejudices and passions of the jury. Even though the trial court acknowledged that an overwhelming display of emotion would be inappropriate, it overruled the objection because the detective had not yet displayed any emotion. Further, the court noted that the evidence was relevant to describe M.B.'s death and that its probative value was not substantially outweighed by its prejudicial impact.
¶ 40 After the court's ruling, Detective Thrumston testified, and Friend moved for a mistrial. According to defense counsel, the only reason for Detective Thrumston's testimony was to elicit an emotional response from the jury. Defense counsel noted that when the prosecutor asked Detective Thrumston whether she was present when M.B. died, the detective stopped speaking, choked up, and could not answer the question. Friend contends that, as a result, the prosecutor asked the detective if she needed a moment to compose herself. However, the record indicates that the prosecutor asked two questions-"And were you present when [M.B.] died? Do you need a moment?"-to which Detective Thrumston responded, "Yes." The detective then clarified that her "yes" answer was in reference to whether she was present when M.B. died, not whether she needed a minute to compose herself.
¶ 41 Subsequently, the court denied the motion for a mistrial because it did not observe any overwhelming display of emotion. While the court acknowledged that the detective had used a tissue to daub her eyes, it did not see any tears or an excessive display of emotion. As a result, the trial court denied the motion.
¶ 42 We conclude that the trial court did not abuse its discretion in admitting Detective Thrumston's testimony and denying the motion for a mistrial. The trial court found that the testimony was relevant to establish that M.B. had died and the manner of her death.
¶ 43 Moreover, in similar circumstances, Colorado courts have held that displays of emotion do not constitute reversible error. See, e.g., People v. Thatcher, 638 P.2d 760, 769 (Colo.1981) (holding that the court did not abuse its discretion when it denied defendant's motion for a mistrial after the victim's husband made emotional displays during closing arguments); People v. Ned, 923 P.2d 271, 276 (Colo.App.1996) (holding that the testimony of the victim's mother was admissible even though she began crying, thrashing about on the witness stand, shaking herself back and forth, screeching, screaming, and stamping her feet).
¶ 44 While Friend had a right to a trial free from testimony that would contaminate or prejudice the jury, the " 'decision to grant a mistrial should be left to the discretion of the trial court, which is best able to judge the effect of the claimed impropriety upon the jury.' " Ned, 923 P.2d at 276 (quoting People v. McGuire, 751 P.2d 1011, 1013 (Colo.App.1987) ). Here, the trial court was in the best position to determine that Detective Thrumston's emotional display was minimal, brief, and appropriate. Thus, the trial court did not abuse its discretion in admitting Detective Thrumston's testimony or denying Friend's motion for a mistrial.
VI. Merger of Convictions
¶ 45 Friend makes two principal contentions regarding merger of his convictions.
*625 First, he argues that the child abuse counts-child abuse causing death, child abuse causing death-pattern of conduct, child abuse causing serious bodily injury (two counts), and child abuse causing serious bodily injury-pattern of conduct-must merge into one conviction because they are alternative ways of committing the offense of child abuse. Second, Friend contends that the child abuse convictions should merge into his conviction for first degree murder of a child under the age of twelve, position of trust. We agree with his first contention, but disagree with his second.
¶ 46 To clarify these issues, we requested the parties to file supplemental briefs addressing the applicability of the following cases: People v. Abiodun, 111 P.3d 462 (Colo.2005) ; Woellhaf v. People, 105 P.3d 209 (Colo.2005) ; People v. Leske, 957 P.2d 1030 (Colo.1998) ; and People v. Raymer, 662 P.2d 1066 (Colo.1983).
¶ 47 Relying on those cases, Friend maintains his position that all of the child abuse convictions should merge into the conviction for first degree murder of a child under the age of twelve, position of trust. However, the People argue that all of the child abuse counts should stand as separate convictions, and that none of those convictions should merge into the first degree murder conviction.
A. Standard of Review
¶ 48 The People recognize that divisions of this court are split as to whether unpreserved double jeopardy claims may be reviewed on appeal. Compare People v. Thomeczek, 284 P.3d 110, 116 (Colo.App.2011) (double jeopardy claims not reviewable for the first time on appeal); People v. Johnson, 74 P.3d 349, 356 (Colo.App.2002) (same); People v. McNeely, 68 P.3d 540, 545 (Colo.App.2002) (same), with People v. Greer, 262 P.3d 920, 924 (Colo.App.2011) (double jeopardy claims reviewable for plain error); People v. Olson, 921 P.2d 51, 53 (Colo.App.1996) (same). They contend we should not address Friend's double jeopardy claim because he did not raise this issue at trial.
¶ 49 We disagree with the People, and, therefore, we review Friend's unpreserved double jeopardy claims for plain error. See, e.g., People v. Zubiate, 2013 COA 69, ¶ 38, 411 P.3d 757 (cert. granted June 16, 2014); People v. Flowers, 128 P.3d 285, 290 (Colo.App.2005).[1] To constitute plain error, error must (1) be obvious, (2) prejudice a substantial right, and (3) cast serious doubt on the reliability of the judgment of conviction. See People v. Tillery, 231 P.3d 36, 48 (Colo.App.2009), aff'd sub nom. People v. Simon, 266 P.3d 1099 (Colo.2011). Plain error requires reversal if, after a review of the entire record, a court can conclude that there was a "reasonable possibility that the error contributed to the sentence." Id .
B. Analysis
¶ 50 The Double Jeopardy Clauses of the United States and Colorado Constitutions protect an accused against multiple punishments for the same crime where the General Assembly has not authorized "multiple punishments based upon the same criminal conduct." Woellhaf, 105 P.3d at 214 ; see also U.S. Const. amend V ; Colo. Const. art II, § 18. Thus, double jeopardy applies when a case involves a multiplicity issue. Woellhaf, 105 P.3d at 214. "Multiplicity is the charging of multiple counts and the imposition of multiple punishments for the same criminal conduct." Id .
¶ 51 The Woellhaf decision identified three types of multiplicity issues. Id. at 214-15. The first type arises when a statute provides alternative ways of committing the same crime. Id . at 215. The second type involves multiple convictions under two or *626 more statutory provisions that prohibit the same criminal act. Id. at 214 ; see also Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The third type involves a case where the prosecution charges a series of repeated acts as separate crimes even though a statute defines those crimes as a continuous course of conduct that constitutes a single crime. Woellhaf, 105 P.3d at 214. Each of these multiplicity issues requires a separate analysis.See id. at 214-15.
¶ 52 Under the first type of multiplicity, we apply a two-part test when the prosecution charges an accused with separate offenses under a statute that provides alternative ways of committing the same crime. Id. at 218-19. Under this scenario, we must first ascertain the unit of prosecution prescribed by the statute and then determine whether the prosecution alleged factually distinct offenses to justify more than one unit of prosecution. Id. ; see also Abiodun, 111 P.3d at 467-70.
¶ 53 Regarding the first prong, the Colorado Supreme Court has held that the General Assembly prescribes a single unit of prosecution when it joins alternative ways of committing a crime with a disjunctive "or" in a single provision of a statute. Abiodun, 111 P.3d at 467 ; People v. Viduya, 703 P.2d 1281, 1292 (Colo.1985) (legislature created a single offense of vehicular homicide by using the disjunctive "or" to define the crime as causing death while operating a motor vehicle either recklessly or while under the influence); People v. Holmes, 129 Colo. 180, 182, 268 P.2d 406, 407 (1954) (use of "or" in burglary statute evidenced alternate ways of committing crime, not separate offenses); Wright v. People, 116 Colo. 306, 310, 181 P.2d 447, 449 (1947) (list of conduct related to checks and drafts evidenced alternate ways of committing forgery).
¶ 54 If a statute prescribes a single unit of prosecution, then the prosecution can charge a defendant with multiple offenses under that statute only if it presents the defendant's actions as factually distinct offenses. See Woellhaf, 105 P.3d at 219 ; see also Quintano v. People, 105 P.3d 585, 591-92 (Colo.2005). In Quintano, 105 P.3d at 591-92, the supreme court held that factors such as location of the acts, lapse of time between the incidents, intervening events, and a defendant's intent as evidenced by his or her actions and statements, tend to establish whether each act constitutes a factually distinct offense. See, e.g., id. at 592 (holding that the evidence supported five separate charged offenses of sexual assault because the defendant committed each act at a different location, had time to reflect after each incident, and significant time elapsed between the incidents).
¶ 55 In contrast, we apply the Blockburger test to determine if one offense is a lesser included offense of another when a defendant is convicted under two or more statutes that prohibit the same conduct. See Woellhaf, 105 P.3d at 214. Under the Double Jeopardy Clauses of the United States and Colorado Constitutions, a defendant cannot be convicted of more than one offense if one of the offenses is included in the other. U.S. Const. amend. V ; Colo. Const. art II, § 18 ; § 18-1-408(1)(a), C.R.S.2013. Thus, we must determine whether "each offense contains an element not contained in the other." United States v. Dixon, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) ; see also People v. Fry, 74 P.3d 360, 369 (Colo.App.2002) (stating that the court compares the elements of the crimes involved and not the evidence used to prove the crimes at trial), aff'd, 92 P.3d 970 (Colo.2004). If the offenses include the same elements, then one is a lesser included offense within the meaning of the Double Jeopardy Clauses, and convictions for both offenses would violate both a defendant's right to be free from double jeopardy, and section 18-1-408(1)(a), unless the offenses are factually distinct. See Dixon, 509 U.S. at 732, 113 S.Ct. 2849 ; see also People v. Carey, 198 P.3d 1223, 1226 (Colo.App.2008).
¶ 56 Here, as noted, the jury convicted Friend of first degree murder-victim under the age of twelve, position of trust under section 18-3-102(1)(f), C.R.S.2013, and the following child abuse offenses under section 18-6-401(1)(a), C.R.S.2013:(1) child abuse causing death; (2) child abuse causing *627 death-pattern of conduct; (3) two counts of child abuse causing serious bodily injury; and (4) child abuse causing serious bodily injury-pattern of conduct.[2]
1. Alternative Ways of Committing an Offense
¶ 57 Friend contends that the child abuse statute sets forth alternative ways of committing an offense and, therefore, his five convictions for counts two through six must merge into a single conviction for child abuse. We agree.
¶ 58 We begin our analysis by considering the first type of multiplicity issue: whether a statute provides alternative ways of committing the same crime. We do so because "[l]ogically preliminary to the question whether one offense is the same as or included within another, is the question whether the legislature intended to create two separate offenses at all." Abiodun, 111 P.3d at 465. As the Abiodun court noted, it is the legislature's prerogative to treat a course of conduct for various acts related in time, nature, or purpose as one or more than one offense. Accordingly, "the legislature may very well choose to define a series of acts, related along a continuum of conduct or motivated by a single objective, for example, as a single crime." Id .
¶ 59 Under section 18-6-401(1)(a), an accused may commit child abuse by (1) causing an injury to a child's life or health; (2) permitting a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health; or (3) engaging in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.
¶ 60 The parties describe this statute as providing for three methods of committing child abuse. However, we conclude that the statutory provision actually describes fourteen ways of committing child abuse. They are:
1. Causing an injury to a child's life;
2. Causing an injury to a child's health;
3. Permitting a child to be unreasonably placed in a situation that poses a threat of injury to the child's life;
4. Permitting a child to be unreasonably placed in a situation that poses a threat of injury to the child's health;
5. Engaging in a continued pattern of conduct that results in malnourishment that ultimately results in the death of a child;
6. Engaging in a continued pattern of conduct that results in malnourishment that ultimately results in serious bodily injury to a child;
7. Engaging in a continued pattern of conduct that results in lack of proper medical care that ultimately results in the death of a child;
8. Engaging in a continued pattern of conduct that results in lack of proper medical care that ultimately results in serious bodily injury to a child;
9. Engaging in a continued pattern of conduct that results in cruel punishment that ultimately results in the death of a child;
10. Engaging in a continued pattern of conduct that results in cruel punishment that ultimately results in serious bodily injury to a child;
11. Engaging in a continued pattern of conduct that results in mistreatment that ultimately results in the death of a child;
12. Engaging in a continued pattern of conduct that results in mistreatment that ultimately results in serious bodily injury to a child;
13. Engaging in a continued pattern of conduct that results in an accumulation of *628 injuries that ultimately results in the death of a child; and
14. Engaging in a continued pattern of conduct that results in an accumulation of injuries that ultimately results in serious bodily injury to a child.
¶ 61 Here, the prosecution charged Friend with five counts of child abuse under subsections (1)(a), (7)(a)(I), and (7)(a)(III) of section 18-6-401. A multiplicity issue involving statutes providing alternate ways of committing the same offense "may arise if imprecise statutory language leads a prosecutor to charge multiple counts of the same offense because a defendant has committed the crime using more than one of the prohibited alternative methods." Woellhaf, 105 P.3d at 215. This is reflected in the jury instructions used in this case. For each count of child abuse causing serious bodily injury or child abuse causing death and their respective pattern of conduct counts, the instructions required the jury to find several of the methods listed above. For instance, an instruction for child abuse causing serious bodily injury required the jury to find the first method of child abuse, causing an injury to a child, or the third method, permitting a child to be unreasonably placed in a situation that posed a threat of injury to the child's life, or the fourth method, permitting a child to be unreasonably placed in a situation that posed a threat of injury to the child's health.
¶ 62 Nevertheless, in Abiodun, the court held that "[w]here ... a number of acts are joined as a disjunctive series, in a single sentence, without any attempt to differentiate them by name or other organizational device, a legislative intent to permit separate convictions and sentences for each enumerated act is not so readily apparent and must be ascertained, if at all, by other aids to statutory construction." 111 P.3d at 466. The child abuse statute at issue here is structured to set forth a disjunctive series of acts in an extended single sentence, without any attempt to differentiate them by name or an organizational device.
¶ 63 Thus, the child abuse statute is similar to the one interpreted in Abiodun . There, the court held that a series of acts, with reference to the same controlled substance and governed by a common mens rea, that included acts that were not mutually exclusive but rather overlapping, constituted different ways of committing a single offense.
¶ 64 Notwithstanding Abiodun and related cases, the People rely on Woellhaf to contend that the disjunctive "or" is not dispositive of the unit of prosecution. They argue that it does not preclude the prosecution from charging Friend with multiple offenses for the same crime. However, Woellhaf is distinguishable.
¶ 65 In that case, the supreme court was not interpreting a sexual assault statute that joined a number of acts in a disjunctive series in a single sentence. See Woellhaf, 105 P.3d at 215. Rather, it interpreted the different categories of intimate parts that would satisfy the statute's element of "any sexual contact." See id . at 217 ("As used in the definition of 'intimate parts,' the word 'or' merely demarcates different intimate parts of the human anatomy.... The General Assembly simply established a list of intimate parts that if touched, satisfy the element of 'any sexual contact.' "). Thus, the People's reliance on Woellhaf is misplaced.
¶ 66 Even if the use of the disjunctive in a statute is not dispositive, the prosecution did not present evidence of factually distinct offenses to show more than one unit of prosecution. See Abiodun, 111 P.3d at 467-70. As noted, for the prosecution to charge multiple counts for the same crime, a defendant's conduct must be separated by time, location, or intervening events, or a defendant must have had adequate time to reflect after each incident. See Quintano, 105 P.3d at 591-92.
¶ 67 As relevant here, the prosecution charged Friend with two counts of child abuse causing serious bodily injury and one count of child abuse causing serious bodily injury-pattern of conduct. The first count of child abuse causing serious bodily injury, count 4, charged that Friend slammed M.B.'s head into the door on January 13, 2008. The second count for the same offense, count 5, charged that Friend slammed her head onto the concrete floor between January 14 and 15, 2008. The People maintain that those *629 two counts do not merge because the prosecution presented them as factually distinct offenses-separate in time and location.
¶ 68 However, the prosecution also charged Friend with count 6, child abuse causing serious bodily injury-pattern of conduct, which also occurred between January 13 and 15, 2008, when he committed the acts stated above. Because count 6 encompasses all of the dates and events alleged in counts 4 and 5, count 6 subsumes those two counts. Therefore, counts 4 and 5 merge into count 6. See Abiodun, 111 P.3d at 471.
¶ 69 Further, contrary to the People's contention, the child abuse statute does not authorize separate convictions for each instance of child abuse and for its respective pattern of abuse. Unlike the sexual assault on a child statute, where the General Assembly has provided a separate subsection for pattern of sexual abuse, the child abuse statute does not have a separate subsection for pattern of child abuse. Cf. § 18-3-405(2)(d), C.R.S.2013 ("Sexual assault on a child is a class 4 felony, but it is a class 3 felony if ... [t]he actor commits the offense as part of a pattern of sexual abuse as described in subsection (1) of this section."). Instead, pattern of child abuse is an alternative way of committing child abuse. Cf . Simon, 266 P.3d at 1108 (pattern of sexual abuse is not an alternative way of committing sexual assault on a child, but rather a sentence enhancer).
¶ 70 Therefore, while a defendant may be convicted of both sexual assault on a child and sexual assault on a child-pattern of abuse, a defendant may not be convicted of both child abuse and child abuse-pattern of conduct. See id. at 1109 (concluding there was no double jeopardy violation because "the plain language [of sections 18-3-405 and 18-3-405.3, C.R.S.2013 ] establishes that the General Assembly intended to authorize separate convictions for each instance of sexual assault on a child or sexual assault by one in a position of trust, and to authorize enhanced punishment of each such assault that is committed as 'a part of a pattern of sexual abuse' ").
¶ 71 Accordingly, all the child abuse counts must merge into one conviction. To consider which conviction should remain, we look to subsection (7) of the child abuse statute, which sets forth the class of felony for different mens rea, where death or injury results and when no death or injury results. For example, when a person knowingly or recklessly commits child abuse resulting in death to the child, it is a class 2 felony, except in certain circumstances, when it is a class 1 felony.See § 18-6-401(7)(a)(I). On the other hand, when no death or injury results, an act of child abuse committed by a person acting knowingly or recklessly is a class 2 misdemeanor, except that in certain circumstances it is a class 5 felony.
¶ 72 Here, Friend's convictions for child abuse causing death and child abuse causing death-pattern of conduct are both class 2 felonies. However, because child abuse causing death-pattern of conduct appears to be a more serious offense, we elect to merge all of the child abuse convictions into child abuse causing death-pattern of conduct. See generally People v. Glover, 893 P.2d 1311, 1314-15 (Colo.1995) ("[T]he effect of jury verdicts should be maximized....").
¶ 73 We conclude the trial court committed plain error in not doing so. The trial court's error satisfies all three prongs of the plain error standard of review.
¶ 74 First, the error was obvious. While there is no case on point discussing double jeopardy under the child abuse statute, the cases cited above hold that the disjunctive "or" provides for alternative ways of committing a single offense. See, e.g., Abiodun, 111 P.3d at 467 ; Viduya, 703 P.2d at 1292 ; Holmes, 129 Colo. at 182, 268 P.2d at 407 ; Wright, 116 Colo. at 310, 181 P.2d at 449. Therefore, the trial court should have permitted the prosecution to charge Friend with only one count of child abuse in or entered only one judgment of conviction on the child abuse charges. See People v. Pollard, 2013 COA 31, ¶ 41, 307 P.3d 1124 ("In light of the well-settled legal principle upon which this rule is based, [and] the prior references in Colorado case law to the rule, ... we conclude that the rule (and any violation of it) should have been 'obvious' to the trial court, despite the fact that there was no Colorado case law squarely on point."). Because of the *630 well-established rule stated above, the error was obvious.
¶ 75 Further, the prohibition against double jeopardy is a substantial right guaranteed by the United States and Colorado Constitutions. See Greer, 262 P.3d at 925. Thus, the error prejudiced Friend's substantial right.
¶ 76 Last, the error undermines the reliability of Friend's convictions. The jury convicted him of multiple counts of child abuse because the court erred in not consolidating multiple counts under the child abuse statute into a single count. In other words, but for the prosecution's multiple charges, the jury would presumably have convicted Friend of only one count of child abuse. The error contributed to his convictions and therefore casts doubt on their reliability.
¶ 77 Accordingly, the trial court committed plain error when it allowed all of Friend's convictions to stand. Thus, we vacate the convictions for child abuse causing death, child abuse causing serious bodily injury-pattern of conduct, and two counts of child abuse causing serious bodily injury.
2. The Strict Elements Test
¶ 78 Friend also contends that all of the child abuse charges under section 18-6-401(1)(a) should merge into his conviction for first degree murder of a child under the age of twelve by one in a position of trust under section 18-3-102(1)(f). We disagree.
¶ 79 Here, the strict elements test requires us to compare the elements of each crime. Dixon, 509 U.S. at 696, 113 S.Ct. 2849.
¶ 80 The crime of first degree murder-child under the age of twelve, position of trust requires that (1) the defendant; (2) in the state of Colorado, at or about the date and place charged; (3) knowingly; (4) caused the death of a child who had not attained twelve years of age; and (5) the defendant was in a position of trust with respect to the victim. § 18-3-102(1)(f).
¶ 81 The crime of child abuse causing death-pattern of conduct requires that (1) the defendant; (2) in the state of Colorado, at or about the date and place charged; (3) knowingly or recklessly; (4) caused an injury to a child; or (5) permitted a child to be unreasonably placed in a situation that posed a threat of injury to the child's life or health; or (6) engaged in a continued pattern of conduct that resulted in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately resulted in the death of the child. § 18-6-401(1)(a), (7)(a)(I).
¶ 82 Each offense contains an element not included in the other. The offense of child abuse causing death-pattern of conduct requires a pattern of conduct, which is not an element of first degree murder. Additionally, unlike child abuse causing death-pattern of conduct, first degree murder of a child under the age of twelve-position of trust requires that a crime be committed against a child under the age of twelve by a defendant who was in a position of trust with respect to the victim. Accordingly, because each offense requires proof of a fact the other does not, the child abuse offense is not a lesser included offense of first degree murder. See Leske, 957 P.2d at 1039.
¶ 83 Therefore, we conclude that the mittimus should be amended to reflect the following convictions: (1) one count of first degree murder of a child under the age of twelve-position of trust; and (2) one count of child abuse causing death-pattern of conduct.
VII. Conclusion
¶ 84 The judgment of conviction is affirmed in part and vacated in part, the sentences for all but one of the merged child abuse convictions are vacated, and the case is remanded for correction of the mittimus in accordance with this opinion.
JUDGE FURMAN and JUDGE DUNN concur.

In Zubiate, the supreme court granted certiorari to determine the standard of review for unpreserved double jeopardy claims. The court has also granted certiorari on that same issue in a number of other cases. See People v. Smoots, 2013 COA 152, 396 P.3d 53 (cert. granted June 30, 2014); People v. Hill, (Colo.App. No. 12CA0168, 2013 WL 4047498, Aug. 8, 2013) (not published pursuant to C.A.R. 35(f) ) (cert. granted June 30, 2014); People v. Reyna-Abarca, (Colo.App. No. 10CA0637, 2013 WL 4008874, Aug. 1, 2013) (not published pursuant to C.A.R. 35(f) ) (cert. granted June 30, 2014); People v. Bunce, (Colo.App. No. 12CA0622, 2013 WL 3974719, July 25, 2013) (not published pursuant to C.A.R. 35(f) ) (cert. granted June 16, 2014).

We note that section 18-6-401(7)(a)(I) and (c), C.R.S.2013, of the child abuse statute refers to first degree murder of a child under the age of twelve, position of trust and cross-references section 18-3-102(1)(f), C.R.S.2013, the statute for first degree murder of a child under the age of twelve, position of trust. However, section 18-3-102(1)(f) does not cross-reference the child abuse statute, and the prosecution's information alleged first degree murder solely under section 18-3-102(1)(f).